

# IN THE
# TENTH COURT OF APPEALS

### No. 10-14-00313-CV

## IN THE INTEREST OF E.M. AND J.M., CHILDREN

**From the 85th District Court**
**Brazos County, Texas**
**Trial Court No. 13-001081-CV-85**

## O P I N I O N

Jessica M. and Daniel M. appeal from a judgment that terminated the parent-child relationship between them and their children, E.M. and J.M. TEX. FAM. CODE ANN. § 161.001 (West 2014). Jessica complains that (1) the trial court erred by admitting statements made by E.M. to her therapist; (2) the evidence was legally and factually insufficient to support the jury's findings regarding the three predicate grounds for termination; (3) the evidence was factually insufficient to support the jury's finding that termination was in the best interest of the children; (4) the trial court erred by refusing to submit a complete definition of the term "endanger" in the jury charge; (5) the trial court erred by refusing to submit the grounds for termination in separate questions or

to instruct the jury that ten of them must agree as to the ground supporting termination; (6) the trial court abused its discretion by submitting additional instructions to the jury without giving her trial counsel an opportunity to review them or to object to them; and (7) the trial court's additional instructions misled the jury. Daniel complains that the trial court erred by admitting the hearsay statements made by E.M. to her therapist and that the evidence was legally and factually insufficient for the jury to have found that termination was in the best interest of the children. Because we find no reversible error, we affirm the judgment of the trial court.

## ADMISSION OF CHILD'S STATEMENTS

In Jessica's first issue and Daniel's first issue, they complain that the trial court abused its discretion in allowing E.M.'s therapist to testify regarding statements made by E.M. during therapy sessions regarding alleged acts of abuse and neglect because they constituted hearsay. The statements made by E.M. included claims that she had been "hit and spanked on the legs, butt, and back," "slapped in the face," and "thrown against the wall." Other statements made by E.M. were that her parents were constantly fighting and yelling at each other; she was not always fed or bathed; sometimes her clothes were not washed; she felt the need to and did in fact take care of her younger brother, J.M.; that her parents had used "smoke" in the house which caused them to act strangely and caused Jessica to either be mean and aggressive toward E.M. and J.M. or ignore them altogether; and that Daniel was living with his sister, with

whom the children had been placed.

The trial court conducted a hearing outside of the presence of the jury regarding the admissibility of the statements, and determined that the statements were admissible pursuant to section 104.006 of the family code or rules of evidence 803(4) or 705. Jessica and Daniel both complain that the statements were not admissible on any of those grounds. Specifically, they complain that the statements were not admissible pursuant to section 104.006 because the claims made in the statements did not constitute abuse and because the statements were not sufficiently reliable.

*Abuse Determination*

The family code permits the admission of hearsay statements by child abuse victims in termination of parental rights proceedings. *See* TEX. FAM. CODE ANN. § 104.006 (West 2014). Section 104.006 provides that, under certain circumstances, a statement made by a child twelve years of age or younger that describes alleged abuse against a child is admissible. The statute allows admission of such a statement, providing: (1) the court finds the time, content, and circumstances of the statement provide sufficient indications of the statement's reliability, and (2) the child testifies or is available to testify at the proceeding in the court, or in any manner provided for by law, or the court determines that the use of the statement in lieu of the child's testimony is necessary to protect the welfare of the child. *Id*.

The term "abuse" as defined in Section 261.001 of the family code includes the

following:

> (A) mental or emotional injury to a child that results in an observable and material impairment in the child's growth, development, or psychological functioning;
>
> (B) causing or permitting the child to be in a situation in which the child sustains a mental or emotional injury that results in an observable and material impairment in the child's growth, development, or psychological functioning; . . .
>
> (I) the current use by a person of a controlled substance as defined in Chapter 481, Health and Safety Code, in a manner or to the extent that the use results in physical, mental, or emotional injury to a child.

TEX. FAM. CODE ANN. § 261.001(1)(A)-(B), (I) (West 2014). This is a non-exclusive list of definitions for abuse. *In re E.C.R.*, 402 S.W.3d 239, 246 (Tex. 2013). However, we will use those definitions as a guide in our analysis.

The therapist testified that E.M. made the statements in question in different sessions throughout her treatment of E.M. E.M. was initially referred for therapy by her primary care physician shortly after the removal from Jessica and Daniel's home due to E.M. being "emotionally disturbed, throwing up after eating and having nightmares and feeling cold." E.M. was almost six years old when she started therapy, and her bi-weekly sessions continued throughout the pendency of the case, which lasted for over a year.

The therapist stated that she had explained to E.M. initially that the purpose of therapy was to talk about whatever E.M. wanted to talk about and to help her feel better with anything she might feel like she needed help with. The therapist relied on

E.M.'s statements to determine how to proceed in therapy. The therapist stated that E.M. was very intelligent and that she found E.M. to be consistent and truthful in her statements throughout her months of therapy. The therapist discussed the difference between the truth and a lie with E.M., which she believed that E.M. understood. E.M. also understood that lying is bad and the therapist opined that E.M. understood the ramifications of not telling the truth to the best of her ability considering her developmental level.

In various sessions, E.M. told the therapist that she and J.M. would get hit and spanked on the legs, buttocks, and back a lot by Jessica. E.M. also stated that she had been thrown against a wall, yelled at, and was called mean names. E.M. claimed that at times there was no food in the house and that at other times, she would have to feed herself. E.M. also stated that she was not bathed and her clothes were sometimes not washed. E.M. took care of those tasks except she could not wash her own clothes very well because she could not reach the washing machine, although she told the therapist that she would try to wash them by hand. Additionally, E.M. expressed that Jessica and Daniel argued a lot and hit each other. In a session, E.M. related an experience where one parent was cut by glass with blood being spattered on a wall and that Daniel had punched a hole in a wall another time during a fight. E.M. stated that many times Daniel would leave during the fighting and leave E.M. and J.M. at home with Jessica, and that Jessica would still be angry after Daniel left and would hit E.M. and J.M.

Further, E.M. described times when the rooms Jessica and Daniel were in were hazy and that there was smoke. At those times, Jessica and Daniel would act differently and if she asked Jessica for something to eat, Jessica would not respond.

The therapist stated that she found E.M.'s statements to be credible because she expressed them in a manner consistent with what the therapist would expect, E.M. recounted the experiences using age-appropriate language, made appropriate eye contact and had appropriate body language, and her statements remained consistent even when E.M. was in different placements, first during the time when E.M. was placed with Daniel's sister, and later after her placement in foster care. Further, E.M.'s statements were not of a type that the therapist believed a child of her age would make up.

The therapist diagnosed E.M. with adjustment disorder with mixed disturbance of emotions and conduct which the therapist determined had impacted E.M.'s ability to function emotionally, socially, and in some behavioral situations. E.M. displayed symptoms of anxiety and other physical symptoms, such as headaches, stomachaches, and muscle tension. The therapist opined that the symptoms are typically the product of prolonged exposure to domestic violence. Further, because of the lack of care of her parents, E.M. had become "parentified," that is, she felt and acted as though it was her responsibility to take care of herself and J.M. in a manner that is excessive for a child of her age. The parentification behaviors continued even when E.M. and J.M. were placed

in foster care, and the therapist was working to help E.M. behave more like a child her age would be expected to act in relation to her care of J.M.

We find that the trial court's determination that the statements made by E.M. constituted abuse as set forth in section 104.006 was not outside of the zone of reasonable disagreement. The therapist's determination that E.M. had suffered significant emotional difficulty due to her parents' continuous fighting, drug use, lack of food and care for the children, and spanking or slapping of E.M. was sufficient for the trial court as the factfinder to have determined that the incidents together rose to the level of abuse. *See In re M.R.*, 243 S.W.3d 807, 812 (Tex. App.—Fort Worth 2007, no pet.) (Child's testimony about mother's drug use, how the child was placed in charge of a younger sibling, how the family found their food in dumpsters, how the family drove around in the middle of the night trying to find a place to sleep, and how the children received spanking from belts, fell within the definition of abuse under TEX. FAM. CODE ANN. § 261.001(1), for purposes of TEX. FAM. CODE ANN. § 104.006.).

*Reliability*

Jessica and Daniel also complain that the trial court abused its discretion by determining that the statements made by E.M. were reliable as required by section 104.006. Section 104.006 requires the trial court to determine "that the time, content, and circumstances of the statement provide sufficient indications of the statement's reliability." TEX. FAM. CODE ANN. § 104.006. This Court has never addressed what

standard is appropriate for a trial court to determine a statement's reliability pursuant to section 104.006. Jessica and Daniel contend that we should follow the Fort Worth court's determination that the standards set forth in *Norris v. State,* which were used in relation to section 38.072 of the code of criminal procedure dealing with outcry testimony, constitute an appropriate guide for determining reliability pursuant to section 104.006. *See In re M.R.*, 243 S.W.3d at 813 (*citing Norris v. State*, 788 S.W.2d 65, 70 (Tex. App.—Dallas 1990, pet. ref'd); *see also Buckley v. State*, 758 S.W.2d 339, 344 (Tex. App.—Texarkana 1988, no pet.) (Cornelius, J., concurring) (setting forth the standards used in *Norris v. State*).

Article 38.072 of the code of criminal procedure also requires a trial court to conduct a hearing outside of the presence of the jury to determine that "the statement is reliable based on the time, content, and circumstances of the statement," which is the same language used in section 104.006. TEX. CODE CRIM. PROC. ANN. art. 38.072(b)(2). We find that the analysis provided in case law from this Court relating to article 38.072 in determining reliability is an appropriate guide for courts to follow in determining reliability pursuant to section 104.006. However, this Court has declined to follow the formulaic standards set forth in *Norris* and *Buckley* in analyzing reliability pursuant to article 38.072. *Jones v. State*, No. 10-13-00106-CR, 2014 Tex. App. LEXIS 7209 at *9 (Tex. App.—Waco July 3, 2014, pet. ref'd).

In *Jones*, this Court held that the phrase, "time, content, and circumstances" in

article 38.072 "refers to the time the child's statement was made to the outcry witness, the content of the child's statement, and the circumstances surrounding the making of that statement." *Id*. (*citing Broderick v. State*, 89 S.W.3d 696, 699 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd).  In making its determination of reliability pursuant to section 104.006, just like in article 38.072, we believe that the focus of the inquiry must remain upon the outcry statement, not the abuse itself.  *Broderick*, 89 S.W.3d at 699.  A child's outcry statement may be held reliable pursuant to article 38.072 even when it contains vague or inconsistent statements about the actual details of the sexual abuse.[1]  *Id*.  We find the same to be true as it relates to section 104.006.

Viewing the time, content, and circumstances of the statements made by E.M. to her therapist, we do not find that the trial court's finding that the time, content, and circumstances of the statements provided sufficient indications of reliability was outside of the zone of reasonable disagreement.  The trial court did not abuse its discretion by allowing the therapist to testify regarding the statements made during her therapy sessions with E.M. except for the statements relating to Daniel residing with E.M. after she had been removed from Jessica and Daniel's home.

In addition to the above statements alleging abuse, Daniel complains that the trial court abused its discretion by admitting testimony by the therapist regarding statements made by E.M. that Daniel was residing with his sister, Reannen, where E.M.

---

[1] Article 38.072 is limited to outcry testimony about sexual abuse only.

and J.M. were initially placed. During her testimony before the jury, the therapist testified that E.M. had suffered an emotional setback because she had been removed from Reannen's home and placed into foster care. E.M. blamed Daniel for her removal and also blamed herself for telling the Department that Daniel was living with Reannen. Daniel objected on the basis of hearsay and the trial court overruled the objection pursuant to section 104.006.

Even if we assume without deciding that the admission of this evidence was erroneous, we find that the admission of this statement was harmless, or did not "probably cause the rendition of an improper judgment." TEX. R. APP. P. 44.1(a)(1). There was testimony that Reannen asked the Department to remove the children from her residence at around the same time E.M. told the Department and her therapist that Daniel was living with them. Reannen did not testify at the trial and there was no evidence that she had tried to regain possession of the children.

We overrule Jessica and Daniel's first issues.

## LEGAL AND FACTUAL SUFFICIENCY

Jessica complains in her second issue that the evidence was legally insufficient to support a finding of any of the predicate grounds for termination. In her third issue, Jessica complains that the evidence was factually insufficient to support a finding of any of the predicate grounds. In her fourth issue, Jessica complains that the evidence was factually insufficient for the jury to have found that termination of her parental rights

was in the best interest of the children. In his second issue, Daniel complains that the evidence was legally and factually insufficient for the jury to have found that termination was in the children's best interest. Jessica and Daniel's parental rights were each terminated based on affirmative findings of section 161.001(1)(D), (E), and (O) of the family code. TEX. FAM. CODE ANN. § 161.001(1)(D), (E), (O) (West 2014).

*Standard of Review*

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one predicate act listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination decisions must be supported by clear and convincing evidence. TEX. FAM. CODE ANN. §§ 161.001, 161.206(a) (West 2014). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting

standards for termination and modification).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id*. We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id*. We disregard all contrary evidence that a reasonable factfinder could have disbelieved. *Id*. We consider undisputed evidence even if it is contrary to the finding. *Id*. That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id*. We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id*. at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id*. at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated subsection (D), (E), or (O) of section 161.001(1) and that the termination of the parent-child

relationship would be in the best interest of the child. TEX. FAM. CODE ANN. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

*Predicate Grounds*

Jessica and Daniel's parental rights were terminated pursuant to subsections (D), (E), and (O) of section 161.001(1) of the family code. Those subsections required a finding that each of them:

> (D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;
>
> (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;
>
> . . . [or]
>
> (O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child . . . .

TEX. FAM. CODE ANN. § 161.001(1)(D), (E), (O) (West 2014). Jessica argues that the evidence was legally and factually insufficient for the jury to have found any of those

grounds by clear and convincing evidence. Daniel did not challenge the sufficiency of the evidence regarding these grounds, but only the best interest determination.

*Sections 161.001(1)(D) and (E)*

Sections 161.001(1)(D) and (E) both require a finding of endangerment. To endanger means to expose to loss or injury, to jeopardize. *Tex. Dep't Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). The specific danger to a child's physical or emotional well-being need not be established as an independent proposition, but it may be inferred from parental misconduct. *See Boyd*, 727 S.W.2d at 533.

> When termination of parental rights is based on section D, the endangerment analysis focuses on the evidence of the child's physical environment, although the environment produced by the conduct of the parents bears on the determination of whether the child's surroundings threaten his or her well-being. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Section D permits termination if the petitioner proves parental conduct caused a child to be placed or remain in an endangering environment. *In re R.D.*, 955 S.W.2d 364, 367 (Tex. App.—San Antonio 1997, pet. denied).
>
> It is not necessary that the parent's conduct be directed towards the child or that the child actually be injured; rather, a child is endangered when the environment creates a potential for danger which the parent is aware of but disregards. *In re S.M.L.*, 171 S.W.3d at 477. Conduct that demonstrates awareness of an endangering environment is sufficient to show endangerment. *Id.* (*citing In re Tidwell*, 35 S.W.3d 115, 119-20 (Tex. App.—Texarkana 2000, no pet.) ("[I]t is not necessary for [the mother] to have had certain knowledge that one of the [sexual molestation] offenses actually occurred; it is sufficient that she was aware of the potential for danger to the children and disregarded that risk by ... leaving the children in that environment.")). In considering whether to terminate parental rights, the court may look at parental conduct both before and after the

birth of the child. *Avery v. State*, 963 S.W.2d 550, 553 (Tex. App.—Houston [1st Dist.] 1997, no pet.). Section D permits termination based upon only a single act or omission. *In re R.D.*, 955 S.W.2d at 367.

*In the Interest of T.R.L.*, No. 10-14-00290-CV, 2015 Tex. App. LEXIS 2178 at *12 (Tex. App.—Waco Mar. 5, 2015, no pet. h.) (*citing Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)).

> Under subsection 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re K.A.S.*, 131 S.W.3d 215, 222 (Tex. App.—Fort Worth 2004, pet. denied); *Dupree v. Tex. Dep't Prot. & Reg. Servs.*, 907 S.W.2d 81, 83-84 (Tex. App.—Dallas 1995, no writ).
>
> Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see* TEX. FAM. CODE ANN. § 161.001(1)(E). It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).

*In the Interest of T.R.L.*, 2015 Tex. App. LEXIS 2178 at *13 (*citing In re T.T.F.*, 331 S.W.3d 461, 483 (Tex. App.—Fort Worth 2010, no pet.).

Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment. *See In re B.J.B.*, 546 S.W.2d 674, 677 (Tex. Civ. App.—Texarkana 1977, writ ref'd n.r.e.); *see also Sylvia M. v. Dallas County Welfare Unit*, 771 S.W.2d 198, 204 (Tex. App.—Dallas 1989, no writ) (considering "volatile and

chaotic" marriage, altercation during pregnancy, and mother's repeated reconciliation with abusive spouse). Abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child. *Ziegler v. Tarrant County Child Welfare Unit*, 680 S.W.2d 674, 678 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.); *see also K.A.S.*, 131 S.W.3d at 222 (violent or abusive conduct by someone within household is environment that endangers children).

A parent's illegal drug use and drug-related criminal activity may also support a finding that the child's surroundings endanger his or her physical or emotional well-being. *In re Z.C.*, 280 S.W.3d 470, 474 (Tex. App.—Fort Worth 2009, pet. denied). And "[b]ecause it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under section 161.001(1)(E)." *Walker v. Tex. Dep't Fam. & Prot. Servs.*, 312 S.W.3d 608, 617-18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (*citing Vasquez v. Tex. Dep't Prot. & Reg. Servs.*, 190 S.W.3d 189, 195-96 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (terminating parental rights despite there being no direct evidence of parent's continued drug use actually injuring child)). A factfinder may reasonably infer from a parent's refusal to take a drug test that the parent was using drugs. *In re C.R.*, 263 S.W.3d 368, 374 (Tex. App.—Dallas 2008, no pet.). A parent's continued drug use demonstrates an inability to provide for the child's emotional and physical needs and to provide a stable environment for the child. *In re*

*F.A.R.*, No. 11-04-00014-CV, 2005 Tex. App. LEXIS 234, 2005 WL 181719, at *4 (Tex. App.—Eastland Jan. 13, 2005, no pet.) (mem. op.).

*Facts*

One morning, law enforcement was called to Jessica and Daniel's residence due to a domestic disturbance. Jessica claimed that this disagreement started because she wanted Daniel to help her get E.M. ready for school but he would not because he was looking for the pipe he used to smoke K2.[2] An argument ensued, during which either Jessica or Daniel head-butted the other, which left a red mark on Jessica's forehead. During the argument, Daniel attempted to leave with the children and was able to place them in his vehicle. Jessica attempted to stop Daniel from leaving and was able to roughly remove E.M. from the vehicle. She was not successful at removing J.M. from the vehicle. Jessica had grabbed a butcher knife when she came out of the house and attempted to use it to puncture Daniel's tires to prevent his departure. Somehow, Jessica sustained a cut on her hand, which caused her to smear blood all over the vehicle during her efforts to stop Daniel from leaving with the children. Drops of Jessica's blood were also found in various locations outside of the house. Daniel was able to leave in his vehicle with J.M. The butcher knife Jessica had used was found in the grass outside of the residence with the tip broken off.

When an officer arrived at the residence, Jessica was in a highly agitated state

---

[2] K2 is a commonly used name for synthetic marijuana, a controlled substance that is unlawful to possess.

and the officer had concerns as to whether she was intoxicated or high on something. Jessica claimed that Daniel had head-butted her during the altercation, which she alleged had started because Daniel wanted to leave with the children to go get some K2. E.M. was at the scene and the officer observed that she was crying, upset, and seemed scared. Daniel's sister, Reannen, came to the residence and attempted to take E.M., but Jessica repeatedly attempted to pull E.M. away from her aunt. E.M. appeared to be afraid of her mother but not of Reannen; however, the officer ultimately allowed E.M. to go with her mother in an ambulance to the hospital even though E.M. wanted to leave with her aunt.

A second officer located Daniel and J.M. at a convenience store. J.M. was ultimately released to Reannen due to safety concerns with Daniel and Jessica due to their anger and agitation. Both officers testified that there was blood smeared on the exterior and interior of the vehicle. Daniel told the officers that Jessica had grabbed the windows attempting to climb on the car. Jessica was attempting to get the children out of the vehicle. There was also blood smeared on the gear shift inside the vehicle, which the officers believed indicated that Jessica was attempting to stop the vehicle while it was in motion. Daniel also claimed that Jessica had head-butted him and that she was the one who wanted to purchase the K2.

At the hospital, Jessica's blood was tested for drugs and she tested positive for opiates, which she claimed came from a half of an unknown pill she had gotten from

her mother the night before. After her release from the hospital, Jessica and Daniel went to the Department's office, where Jessica and Daniel got into an argument and Jessica was ultimately escorted from the building. The Department decided to remove the children at that time.

Jessica and Daniel had a pattern of significant arguments between them. Each of them alleged to various providers of services during the pendency of the case that each had struck the other during their marriage. Daniel admitted that he had gotten so angry that he punched holes in the walls of the residence on at least one occasion, and holes were found in a wall at their residence. Daniel claimed that Jessica had punched him in the face numerous times. E.M.'s statements to her therapist during therapy demonstrated a significant, repeated exposure to her parents' aggressive behaviors toward each other, and of Jessica toward E.M. and J.M. as well. Daniel also expressed that E.M. was extremely afraid of Jessica. E.M.'s therapist testified that E.M. was fearful of her mother and did not want to be returned to her parents because she did not feel safe with them.

Both Jessica and Daniel contended that the other had a drug problem, primarily with the use of K2. Jessica had tried to have Daniel arrested for violating his felony community supervision multiple times based on his alleged drug use, and recordings of two 911 calls made by Jessica were admitted into evidence. A witness testified that Jessica and Daniel had lived with him for a few months approximately a year before the

trial and that both Jessica and Daniel used K2 and were high at times when the children were in the home. Daniel had filed for divorce less than a year prior to the removal of the children and filed an affidavit in which he stated under oath that Jessica used drugs and was violent toward him and the children. He had left the home with the children and did not allow Jessica to have contact with them. He and Jessica later reconciled and the divorce proceedings were dismissed.

Daniel had been placed on community supervision for stealing copper wire in late 2008. The State filed a motion to revoke his community supervision due to positive drug tests, failure to take drug tests, failure to report to his community supervision officer and complete his community service, and failure to complete drug treatment. Approximately five months prior to the termination trial, Daniel's community supervision was revoked and he was sentenced to two years in a state jail. Daniel was released on an appeal bond pending the resolution of his appeal of that sentence.

Daniel had taken 43 drug screens, of which only 19 were negative during his community supervision. He did not take three tests while the revocation was pending. Daniel tested positive for marijuana and opiates, but was not tested for K2. He admitted to problems with marijuana and K2 use, and admitted to using K2 as recently as the day before the children's removal. Daniel had provided his community supervision officer with 39 prescriptions for hydrocodone from twenty different medical providers. Daniel contended that he was taking hydrocodone to minimize pain

from a car accident in the past. Jessica complied with the drug screens, but a test of her hair showed a positive result for methamphetamine approximately two months before the trial in this proceeding. Jessica denied using any illegal drugs but claimed that cold medicine given to her by friends had caused the positive result.

Additionally, during his period of community supervision, Daniel had reported that he had twenty different jobs, sixteen different residences, and that he had lived in a vehicle at least twice. He stated that he had spent $100 to $200 per month on drugs while he was using them. Daniel acknowledged that E.M. had complained to him about not having anything to eat, although he attempted to clarify those claims at trial by stating that E.M. was wanting junk food, which they did not have. In one of the 911 calls, Jessica told the dispatcher that she had no milk or toilet paper in the house because of Daniel's spending habits and drug use.

Both Jessica and Daniel testified that they regretted their arguments and how the argument on the day of the removal scared E.M. Jessica described herself as "a scary monster covered with blood" when expressing the impact of the altercation that day on E.M. Jessica and Daniel both claimed that their arguments were not physical with each other and that the claims regarding the lack of food in the house was not true. Jessica stated that she made those allegations to make Daniel look bad. Daniel testified that the affidavit he signed for the divorce proceedings contained many exaggerations made by his divorce attorney in his effort to get conservatorship of the children.

By considering all the evidence in the light most favorable to the trial court's findings, we hold that a reasonable factfinder could have formed a firm belief or conviction that Jessica's parental rights should be terminated under subsections 161.001(1)(D) or 161.001(1)(E).  Regarding factual sufficiency, after considering all of the evidence, we hold that a reasonable factfinder could have formed a firm belief or conviction that Jessica's rights should be terminated.  The evidence is legally and factually sufficient to support the jury's findings that Jessica's parental rights should be terminated under subsections 161.001(1)(D) or 161.001(1)(E).  Because we have found that the evidence was legally and factually sufficient as to at least one predicate act, we do not address Jessica's complaints regarding section 161.001(1)(O).  We overrule Jessica's issues two and three.

***Best Interest of the Children***

*Daniel*

In Daniel's second issue, Daniel complains that the evidence was legally and factually insufficient to support the jury's finding that termination of the parent-child relationship was in the children's best interest.  We have held that, to preserve for appellate review a legal sufficiency complaint in a termination case tried to a jury, a party must make that complaint in the trial court by:  (1) a motion for new trial; (2) a motion for an instructed verdict; (3) an objection to the submission of a question in the jury charge; (4) a motion for a judgment notwithstanding the verdict; or (5) a motion to

disregard the jury's answer to a question in the verdict. *In re H.D.B.-M.*, No. 10-12-00423-CV, 2013 Tex. App. LEXIS 2057, 2013 WL 765699, at *8-9 (Tex. App.—Waco Feb. 28, 2013, pet. denied) (mem. op.). We have also held that in order to preserve a factual sufficiency complaint in a termination case for appellate review, a party must make that complaint in the trial court in a motion for new trial. TEX. R. CIV. PROC. 324(b)(2); *In re A.M.*, 385 S.W.3d 74, 78-79 (Tex. App.—Waco 2012, pet. denied).

The record reflects that Daniel did not preserve his complaints regarding the legal sufficiency of the evidence in any of the above-described ways or file a motion for new trial to complain of the factual insufficiency of the evidence. Accordingly, Daniel's second issue is overruled.

*Jessica*

In her fourth issue, Jessica complains that the evidence was factually insufficient to support the jury's finding that termination of the parent-child relationship was in the children's best interest. Jessica did file a motion for new trial raising this issue in the trial court, which was overruled by operation of law.

In determining the best interest of a child, a number of factors have been considered, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these

individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). This list is not exhaustive, but simply indicates factors that have been or could be pertinent. *Id.*

The *Holley* factors focus on the best interest of the child, not the best interest of the parent. *Dupree v. Tex. Dep't Prot. & Reg. Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ). The goal of establishing a stable permanent home for a child is a compelling state interest. *Id*. at 87. The need for permanence is a paramount consideration for a child's present and future physical and emotional needs. *In re S.H.A.*, 728 S.W.2d 73, 92 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) (en banc).

Jessica argues that the determination of the best interest of the children should be prospective in nature only, and actions prior to the removal of the children should not be considered in our analysis. However, Jessica cites to no authority to support her position, and the same evidence proving acts or omissions under section 161.001(1) of the family code has been held to be probative of best interest of the child. *In the Interest of C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

Evidence of past misconduct or neglect can be used to measure a parent's future conduct. *See Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied); *Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is

often prologue."); *see also In re A.M.*, 385 S.W.3d 74, 82-83 (Tex. App.—Waco 2012, pet. denied) (concluding that evidence of mother's history of neglecting and endangering children by exposing them to domestic violence supported trial court's finding that termination was in child's best interest). Evidence of a recent improvement does not absolve a parent of a history of irresponsible choices. *In re T.C.*, No. 10-10-00207-CV, 2010 Tex. App. LEXIS 9685, 2010 WL 4983512, at *8 (Tex. App.—Waco Dec. 1, 2010, pet. denied) (mem. op.); *Smith v. Tex. Dep't Prot. & Reg. Servs.*, 160 S.W.3d 673, 681 (Tex. App.—Austin 2005, no pet.). We decline to restrict our analysis of the best interest of the children to conduct that occurred after the removal of the children.

*Analysis*

E.M. was extremely fearful of Jessica and did not feel that she would be safe with her mother. Because of her age, this evidence is of limited value. This Court has previously held that without a showing of sufficient maturity, a child's preference is not considered in determining the best interest of a child. *In re A.M.*, 385 S.W.3d at 82. E.M.'s therapist testified that E.M. had been subjected to emotional harm and would be harmed emotionally and require therapy potentially through adulthood if she were returned to either of her parents.

During the pendency of the proceedings, Jessica lived in multiple residences, had multiple jobs, and did not establish that she had a stable home for the children if they were to be returned to her. She suffered from bipolar disorder and was not consistent

with taking her medication. Jessica was also significantly hampered by ADHD, which Jessica's therapist believed would affect her parenting ability. Jessica's therapist agreed that she was not ready to have the children returned to her at the time of the trial.

Jessica blamed virtually all of the difficulties she faced on Daniel. Jessica and Daniel had separated several months after the removal of the children and remained separated at the time of trial. Almost immediately after their separation, Daniel became involved in a relationship with a former friend of Jessica's named Kayla who he intended to marry as soon as he was divorced and with whom he had a child. Kayla was also on felony probation out of another state. Jessica was very upset about this relationship. At the time of the trial, Jessica was living with a boyfriend but had plans to move into her own place with the children at her current place of employment, where she was cleaning trailers on a ranch that had oil fields on it. Jessica had multiple residences during the pendency of the case, but believed her current residence was stable.

The children were placed in a foster home where the foster parents were committed to the care of the children. E.M. and J.M. were very bonded to the foster family and the Department's goal was for the foster family to adopt them. The Department's employees, the guardian ad litem, and E.M.'s therapist all testified that they believed that termination was in the best interest of the children.

When we consider all of the evidence in a neutral light, guided by the *Holley*

factors, we hold that the evidence is such that jurors could reasonably form a firm belief or conviction that termination of Jessica's parental rights was in the best interest of the children. Therefore, the evidence was factually sufficient to support the jury's finding. We overrule Jessica's fourth issue.

**JURY CHARGE ERRORS**

*Refusal to Submit Instruction*

In her fifth issue, Jessica complains that the trial court abused its discretion by refusing to submit her proposed definition of "endanger" in the jury charge. The jury charge defined "endanger" as "to expose to loss or injury, to jeopardize. It is not necessary that the conduct be directed at the child or that the child actually suffers injury." Jessica sought the inclusion of an instruction that the conduct required to support an affirmative finding pursuant to section 161.001(1)(E) must have been "a voluntary, deliberate and conscious course of conduct." Jessica argues that this is because the jury could have potentially determined that the one altercation on the day of the children's removal was sufficient for the jury to have affirmatively found that she "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child" based on that one act rather than a course of conduct. TEX. FAM. CODE ANN. § 161.001(1)(E).

We review a trial court's decision to submit or refuse a particular jury instruction under an abuse of discretion standard. *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex.

2006).  When submitting a jury charge, the trial court is afforded more discretion when submitting instructions than when submitting questions.  *In re A.R.*, 236 S.W.3d 460, 478 (Tex. App.—Dallas 2007, no pet.).  To be proper, an instruction must (1) assist the jury, (2) accurately state the law, and (3) find support in the pleadings and the evidence.  *Tex. Workers' Comp. Ins. Fund v. Mandlbauer*, 34 S.W.3d 909, 912 (Tex. 2000).  The omission of an instruction is reversible error only if the omission probably caused the rendition of an improper judgment.  *Shupe*, 192 S.W.3d at 579.

The only authority either party cites that is directly on point regarding the inclusion of this instruction in the jury charge is *In re K.H.*, No. 12-05-00077-CV, 2006 Tex. App. LEXIS 9661 at *8 (Tex. App.—Tyler Nov. 8, 2006, no pet.).  In that appeal, the appellant had requested an instruction on the definition of "conduct" pursuant to 161.001(1)(E), which is very close to the instruction sought by Jessica.  The Tyler Court of Appeals found that "[a]lthough we admit that the requested definitions are more detailed than those in the jury charge, we cannot conclude that these definitions were necessary for the jury to render a proper verdict."  *In re K.H.*, 2006 Tex. App. LEXIS 9661 at *8 (*citing Harris County v. Bruyneel*, 787 S.W.2d 92, 94 (Tex. App.—Houston [14th Dist.] 1990, writ denied)).  We find that based on the record as a whole, while the instruction is not inherently improper, the instruction was not so necessary to enable the jury to properly render a verdict that the court's refusal probably did cause rendition of an improper verdict.  *Harris County*, 787 S.W.2d at 94 (*citing Steinberger v.*

*Archer County*, 621 S.W.2d 838, 841 (Tex. App.—Fort Worth 1981, no writ); *see also* Tex. R. App. P. 44.1(a)(1).  We overrule Jessica's fifth issue.

### *Broad-form Submission*

In her sixth issue, Jessica complains that the trial court abused its discretion by failing to submit the grounds for termination as separate questions or by including an instruction that at least 10 of the jurors must agree as to which predicate act was used to support the termination of her parental rights.  During the charge conference, Jessica requested an instruction be included in the jury charge which would have required the agreement of at least 10 jurors on the same specific predicate act for terminating her parental rights.  The judge denied Jessica's request.  Jessica specifically stated that she was not seeking to bifurcate the question and never requested that the trial court submit the predicate grounds separately.

### *Preservation of Error*

In addressing a separate issue regarding the submission of broad-form questions in the jury charge, the Texas Supreme Court has cited to its prior holdings setting forth that in order to preserve error regarding the submission of the grounds for termination in a broad-form question for appeal, it is necessary for the complaining party to make a specific objection to the form of the charge to put the trial court on notice of the alleged error and afford the court an opportunity to correct the error.  *See Thota v. Young*, 366 S.W.3d 678, 691 (Tex. 2012) (discussing its holdings in *In re A.V.*, 113 S.W.3d 355, 363

(Tex. 2003)) (holding that the parent failed to preserve the issue for appellate review because he did not make "a specific objection to the charge to put [the] trial court on notice to submit a granulated question to the jury"), and *In re B.L.D.*, 113 S.W.3d 340, 349-50 (Tex. 2003); TEX. R. APP. P. 33.1.

Jessica argues that by raising the complaint regarding broad-form submission in her objections to the proposed judgment, she has preserved error regarding this issue. However, the rules of civil procedure require an objection to the charge be made before it is read to the jury. *See* TEX. R. CIV. P. 272; *King Fisher Marine Serv., L.P. v. Tamez*, 443 S.W.3d 838, 843 (Tex. 2014) ([Rule 272] "provides that a trial court may not consider any objections made after the charge is read to the jury."). Consequently, Jessica's objection to the submission of the predicate acts in broad-form submission that were made in her objections to the proposed judgment was untimely and did not preserve this issue for our review.

Jessica further complains that the submission of the broad-form question prevented the trial court from complying with rule 306 of the rules of civil procedure, which states that in a suit for termination of the parent-child relationship, "the judgment must state the specific grounds for termination…." TEX. R. CIV. P. 306. However, Jessica also did not make this complaint to the trial court. Rather, in her objections to the proposed judgment, Jessica sought a modification to the judgment to remove the specific predicate acts entirely, and we have found no other potential

objection on this basis in the record. In order to preserve error for appellate review, a party's argument on appeal must comport with its argument in the trial court. *See In re D.E.H.*, 301 S.W.3d 825, 829 (Tex. App.—Fort Worth 2009, pet. denied). Because the objection at trial did not comport with the objection on appeal, this complaint was not preserved. TEX. R. APP. P. 33.1(a).

Jessica also argues that the trial court abused its discretion by refusing her request for an instruction to be included in the jury charge regarding the requirement of the agreement of 10 jurors as to any predicate act. This issue was addressed and settled by the Texas Supreme Court in *Texas Department of Human Services v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990) (op. on reh'g). In *E.B.*, an appeal from a termination of parental rights, the charge required the jury to answer "yes" or "no" to the question of whether the parent-child relationship between a mother and her two children should be terminated, but did not require the jurors to agree on which of the two alleged statutory grounds for termination had been proven. *Id*. at 648. The court of appeals considered the charge to be improper because it permitted the State "to obtain an affirmative answer without discharging the burden that the jury conclude that a parent violated one or more of the grounds for termination under the statute." *Id*. at 649. The Supreme Court disagreed and reversed, and in its analysis explained:

> The controlling question in this case was whether the parent-child relationship between the mother and each of her two children should be terminated, not what specific ground or grounds under [the predecessor to family code section 161.001] the jury relied on to answer affirmatively

the questions posed. All ten jurors agree that the mother had endangered the child by doing one or the other of the things listed in [the predecessor to section 161.001]. Respondent argues that the charge, as presented to the jury, violates her due process right by depriving a natural mother of her fundamental right to the care, custody and management of her children. Recognizing her rights does not change the form of submission. . . . Here the trial court tracked the statutory language in the instruction and then asked the controlling question. This simply does not amount to abuse of discretion.

*Id*.

Because we have found that the trial court did not abuse its discretion by refusing Jessica's requested instruction and the other complaints regarding broad-form submission and rule 306 of the rules of civil procedure were not properly preserved, we overrule Jessica's sixth issue.

## ERRORS DURING JURY DELIBERATION

### *Answers to Jury Questions*

In her seventh issue, Jessica complains that the trial court abused its discretion by submitting additional instructions to the jury in response to two questions without giving her trial counsel an opportunity to review the questions or proposed answers or to object to the proposed answers. During deliberations, the jury sent out a note that asked the following two questions: (1) "If either parent given possessory conservatorship, is there a chance that it could be changed to managing conservatorship in the future?" and (2) "If answer to 1 above is yes, who would make that decision?"

The trial court read the questions and his proposed answers to the parties

present in the courtroom. The record does not reflect if Jessica or her trial counsel were present, although the record contains comments and objections by counsel for the Department, counsel for Daniel, and the attorney ad litem. The record is also silent as to whether the trial court or anyone else attempted to contact Jessica or her trial counsel to inform them of the note.

Rule 286 of the rules of civil procedure authorizes a trial court to give further instructions to the jury during deliberations. *See* TEX. R. CIV. P. 286. These instructions are to be given in conformity with the rules relating to the charge, which requires submission to the parties or their attorneys for their inspection and that a reasonable time to review and object outside of the presence of the jury. TEX. R. CIV. P. 272. Jessica argues that she was not given the opportunity to review or to object to the answers to the jury's questions because she was not present at the time the trial court considered them.

A party and their counsel have a right to be present in court for all proceedings. *See In re C.I.*, No. 04-95-00827-CV, 1996 Tex. App. LEXIS 4139 at *6-7 (Tex. App. San Antonio Sept. 18, 1996, no pet.); *Scroggs v. Morgan*, 133 Tex. 581, 130 S.W.2d 283, 285 (1939). However, it is a right that can be waived. *In re C.I.*, 1996 Tex. App. LEXIS 4139 at *6; *Maryland Casualty Co. v. Gideon*, 213 S.W.2d 848, 852 (Tex. Civ. App.—El Paso 1948, no writ) (waiver by voluntary absence); *Pantazis v. Dallas Ry. & Terminal Co.*, 162 S.W.2d 1018, 1021 (Tex. Civ. App.—Dallas 1942, writ dism'd) (voluntary absence waives right

of counsel to be present). According to rule 288 of the rules of civil procedure, the trial court "shall be deemed open for all purposes connected with the case before the jury" during deliberations. TEX. R. CIV. P. 288. And while it may be common practice to rely on the trial court or the clerk to contact the lawyers in the event of a jury note, the practice is not required or even contemplated by the rules. Because the court remains open for all purposes, there is no requirement for additional notice to the parties not in the courtroom when issues such as the proper response to a jury note are presented to the trial court for determination, and we are not willing to impose a duty upon the trial court to provide further notice to absent parties in the absence of an agreement to do so. In such events, the court is authorized to proceed and rule on the issue. We hold that the right of a party and his counsel to be present and heard at the time of such ruling is waived by their voluntary absence from the courtroom without the record affirmatively reflecting a different practice. *See In re C.I.*, 1996 Tex. App. LEXIS 4139 at *7 (*citing Gideon*, 213 S.W.2d at 852 and *Pantazis*, 162 S.W.2d at 1021.). We find that the record does not reflect an arrangement between the trial court and the parties regarding notice in the event a note was received from the jury during a party's absence. Because of this, the trial court did not abuse its discretion by proceeding to answer the jury's question without notifying Jessica's trial counsel. We overrule Jessica's seventh issue.

### Response to Jury Note

In her eighth issue, Jessica complains that the trial court's additional instructions

were misleading to the jury. The trial court's response to the jury's first question regarding whether possessory conservators could later be named managing conservators was "Yes." The trial court's response to the second question regarding who would make that determination was that "[t]he decision would be made by a judge or by a jury by any party requesting a jury." Jessica does not argue that the trial court erred by giving answers to the questions; Jessica argues that the trial court's responses were insufficient in that an instruction should also have been included that any modification would require evidence of a material change in circumstances. *See* TEX. FAM. CODE ANN. § 156.101. Jessica contends that because of these questions, the jury was clearly considering appointing her as a possessory conservator.

Initially, we note that by finding that Jessica voluntarily waived the right to be present in the courtroom during deliberations, any objections to the response made by the trial court were also waived. In order to preserve error for appeal, it is necessary for a party to make an objection to the trial court in some manner. TEX. R. APP. P. 33.1(a). Jessica did not object to the trial court's responses in her motion for new trial or any other filing with the trial court. Because we have found that the trial court did not abuse its discretion by answering the jury questions without Jessica's approval because Jessica waived her right to present her objections, we further find that this objection to the substance of the answers actually given was not preserved. We overrule Jessica's

eighth issue.[3]

**CONCLUSION**

Having found no reversible error, we affirm the judgment of the trial court.


TOM GRAY
Chief Justice

Before Chief Justice Gray,
    Justice Davis, and
    Justice Scoggins
Affirmed
Opinion delivered and filed May 28, 2015
[CV06]



---

[3] Even if Jessica was not required to preserve this complaint, we disagree that the additional instruction was necessary to answer the jury's questions to the trial court. The trial court's answers were in direct response to the questions as asked by the jury, and were not misleading.