

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-17-00666-CV

**IN THE INTEREST OF R.M.P.** and J.A.P., Jr., Children

From the 224th Judicial District Court, Bexar County, Texas
Trial Court No. 2016-PA-00286
Honorable John D. Gabriel, Jr., Judge Presiding

Opinion by:    Sandee Bryan Marion, Chief Justice
Dissenting Opinion by: Rebeca C. Martinez, Justice

Sitting:       Sandee Bryan Marion, Chief Justice
               Rebeca C. Martinez, Justice
               Irene Rios, Justice

Delivered and Filed:  June 13, 2018

AFFIRMED

Appellant appeals the trial court's order terminating his parental rights to his two children

R.M.P. and J.A.P., Jr., who we will refer to in this opinion by the pseudonyms "Ruth" and "John."

Appellant challenges the sufficiency of the evidence to support the trial court's finding that

termination was in the children's best interest.  Appellant also contends the trial court abused its

discretion by failing to include a jury question regarding conservatorship.  We affirm the trial

court's order.

### BACKGROUND

On February 4, 2016, no family member could be located to care for Ruth and John after

Appellant's arrest.  Ruth and John were in fifth and second grade, respectively.  Both children had

special needs and attended special education classes.  Although Appellant was allowed to pick the

children up after he was released from police custody the same day,[1] the children were removed from his care the following day after Ruth made an outcry of sexual abuse. Ruth later recanted the outcry, and her counselor testified she did not believe Appellant had sexually assaulted Ruth.

A jury trial began on August 7, 2017. Appellant, who is seventy-seven years old, was present and testified at trial. The children's mother, Roseanna,[2] was not present; her attorney informed the jury during opening and closing arguments that Roseanna was incarcerated and suffering from severe health issues, including diabetes and cancer "that is probably going to take her life within the next year or so." At the time of trial, Ruth was thirteen, and John was nine. After hearing two days of testimony from eight witnesses, the jury found both Appellant's and Roseanna's parental rights should be terminated.

### STANDARD OF REVIEW AND STATUTORY REQUIREMENTS

To terminate parental rights pursuant to section 161.001 of the Code, the Department has the burden to prove by clear and convincing evidence: (1) one of the predicate grounds in subsection 161.001(b)(1); and (2) that termination is in the best interest of the child. *See* TEX. FAM. CODE ANN. §§ 161.001, 161.206(a) (West Supp. 2017); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). The jury was charged on both requirements and found Appellant's parental rights should be terminated.

In a legal sufficiency review of findings in a parental termination case,[3] we "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d

---

[1] The charge against Appellant was dismissed. Appellant testified he was arrested because he had the same name as the suspect.

[2] Roseanna is not a party to this appeal.

[3] Although Appellant challenges both the legal and factual sufficiency of the evidence, he waived his right to complain about the factual sufficiency of the evidence because he did not file a motion for new trial. TEX. R. CIV. P. 324(b)(2); *In re E.M.*, 494 S.W.3d 209, 225 (Tex. App.—Waco 2015, pet. denied); *In re A.C.*, 394 S.W.3d 633, 639 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

256, 266 (Tex. 2002). "To give appropriate deference to the factfinders conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id.* "A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* In addition, we defer to the factfinder's determinations of witness credibility and weight of the evidence as long as they are not unreasonable. *See In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005); *In re F.M.*, No. 04-16-00516-CV, 2017 WL 393610, at *4 (Tex. App.—San Antonio Jan. 30, 2017, no pet.) ("The [trier of fact] is the sole judge of the weight and credibility of the evidence, including the testimony of the Department's witness[es]."). "[W]itness credibility issues that depend on appearance and demeanor cannot be weighed by the appellate court; the witnesses are not present." *In re J.P.B.*, 180 S.W.3d at 573 (internal quotation omitted).

### BEST INTEREST FINDING

Appellant challenges the sufficiency of the evidence to support the jury's finding that termination was in the best interest of the children. In determining the best interests of a child, courts apply the non-exhaustive *Holley* factors to shape their analysis. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). Those factors include: (1) the desires of the child; (2) the present and future emotional and physical needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans held by the individuals seeking custody of the child; (7) the stability of the home of the parent and the individuals seeking custody; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions

of the parent. *Id*. The foregoing factors are not exhaustive, and "[t]he absence of evidence about some of [the factors] would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). "A trier of fact may measure a parent's future conduct by his past conduct [in] determin[ing] whether termination of parental rights is in the child's best interest." *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

### A. Desires of the Children

Appellant testified both children told him they wanted to return home. Ruth told her counselor she wanted to return home with her brother and father; however, she also told her counselor she likes her foster home where she had been living since her removal by the Department. When phone visits were established between Ruth and Appellant, Ruth began urinating on herself, and her counselor believed there was a correlation. Based on Ruth's IQ and special needs, both Ruth's counselor and the Department's caseworker testified Ruth is not capable of deciding where she should live. Although Ruth was thirteen, Ruth's counselor explained Ruth has the maturity level of a seven-year-old. Both children want to live with each other.

### B. Present and Future Emotional and Physical Needs of and Danger to the Children

Although Appellant testified he understood the children had special needs, he told the caseworker he believes the children are normal.

Ruth was in fifth grade when she was removed by the Department and has an IQ of 60. Although Ruth was in special education classes, Appellant did not know the reason she was in the classes. Appellant believed Ruth's only diagnosis was for seizures, and "[w]hen she gets over [the] seizures, she's okay." Ruth's counselor testified Ruth's diagnoses included bipolar disorder and depressive disorder with psychotic features. Although thirteen years old, Ruth had the maturity level of a seven-year-old when dealing with people. As a result, Ruth did not understand

strangers can be dangerous, and many of her behaviors were to seek attention. Ruth's counselor testified Ruth told her that she engaged in attention-seeking behaviors because "she wants people to talk to her, she wants them to notice her." Rather than trying to address the reason for the behaviors, Appellant would give Ruth extra attention. Because of these behaviors, Ruth's counselor testified Ruth needs constant supervision.

John was in the second grade when he was removed. Appellant believed John's diagnoses were seizures and autism. Appellant denied John had ADHD even though John's pediatrician listed ADHD as one of his diagnoses and John was taking medication for ADHD when he was removed. Appellant denied John was having behavior problems in school; however, the caseworker testified John's school records documented problems including his history of aggression and hitting other students and computers. The caseworker further testified the school records showed Appellant had signed documents informing him about John's issues and rages at school, and the school records showed John was hospitalized in 2014 because of his behavior. John's pediatrician recalled that she was told by Appellant that John was doing well in school. Although Appellant took the children to their medical appointments, Dr. August Saravia, who treated the children's seizures, testified doctors are only aware of issues with children if they are reported. Appellant denied John was ever physically violent and did not recall telling CPS John just had to ride out the fits when he had them; however, John was so physically aggressive when he was removed by the Department that he had to be hospitalized, and the Department placed him at its highest level of care. The caseworker explained the Department has four levels of care: basic, moderate, specialized, and intense, and John was initially placed at the intense level. The caseworker testified John became physically aggressive when told "no." When the caseworker was transporting John from the hospital to the first residential treatment facility where he was placed, she told John "no," and she had to chase him down in the parking lot. After he was in the

car, John started throwing toys and hitting the car window, almost breaking it, before the caseworker pulled over. John's pediatrician also testified John had "significant behavioral problems," including "problems with aggression and oppositional behaviors," and noted Appellant sometimes gave John extra doses of his medication because of his behavior. John's pediatrician also testified John was obese.

Although Appellant testified the caseworker never explained the children's diagnoses to him, the caseworker testified the diagnoses were explained to Appellant at family group conferences, and she had attempted to discuss the children's special needs with Appellant on numerous occasions. Appellant was also sent a written copy of the family service plan that listed all the medical diagnoses of the children and the medications they were taking. The caseworker testified Appellant does not understand the children's diagnoses or how to care for them.

C.      Parenting Abilities/Programs Available to Assist/Parent's Acts or Omissions

The Appellant had a history with the Department for neglectful supervision beginning in 2008. On two prior occasions, Appellant was offered services by the Department, and each time he failed to complete his counseling.

On the day of Appellant's arrest, he allowed the Department's investigator to go to his home to retrieve the children's medication while he was still in police custody. The investigator discovered Roseanna in the home which appeared to have been broken into. Because of Roseanna's condition and behaviors, the investigator instructed Appellant not to return to the home with the children after he was released from police custody. Appellant did not follow those instructions but instead returned with the children to the home. The following day, when the investigator arrived for a follow-up visit, she observed Roseanna yelling and screaming, crawling around in front of the house, and throwing things at Appellant and Ruth. Although Appellant denied Roseanna lived at the home, the children stated she lived there, and the investigator

observed Roseanna's belongings in the home. After the children were removed, Appellant denied on-going contact with Roseanna; however, he allowed Roseanna to talk to Ruth during some of his telephone calls with Ruth, stating Roseanna was present for the phone calls because "she went to pick up her mail."[4] He also took Roseanna with him on one of his monthly visits with John. Finally, one of Appellant's therapists testified Roseanna accompanied Appellant to some of his sessions.

When Appellant was offered services by the Department after the removal, he did not believe he had anything to learn through services. As a result, Appellant was not receptive to any of the services offered. Appellant was discharged by three therapists because he refused to engage in counseling. Appellant was unable to understand that even if Ruth's outcry was false, the outcry meant Ruth had issues that needed to be addressed.[5] The caseworker testified Appellant was unable to process that issues existed that needed to be addressed or that he needed to gain knowledge regarding the children's special needs. One of Appellant's therapists stated Appellant "didn't believe he had anything to work on in counseling and didn't need any support in parenting." Although Appellant completed parenting classes, the caseworker testified he was unable to verbalize anything he learned. When Appellant was asked what he was taught in the classes with regard to dealing with the children's special needs, Appellant testified "what were they going to

---

[4] Ruth's counselor testified Ruth faithfully called Appellant every Friday after the telephone visits were established, but many times Appellant would not answer the calls.

[5] In explaining the reason he believed Ruth made the outcry, Appellant testified when Ruth was ten or eleven, he told her he was going to call CPS to come and take her away for a few months because she refused to listen to him. Ruth told Appellant that if he called CPS, "she was going to say something bad about [him]." Appellant further testified as follows:

> Q. And so it's your position that because you called CPS on [Ruth] in 2014, she waited two whole years to get back at you for that? That's what you're saying?
> A. Well, I don't remember about that. Maybe so.
> Q. And you believe that this 12-year-old special needs child of yours was capable of that?
> A. Well, I don't know. Maybe.

Appellant also testified he took Ruth to the hospital to be examined when she made three or four prior allegations of sexual abuse, and the hospital "said nothing was wrong with her." Appellant never took Ruth to a counselor to address the allegations.

show me that I don't know, other than giving them the medication." When Appellant was asked what he would do differently if the children were returned to his care, Appellant responded, "Well, now that the kids have grown up more, I don't see no problem there, ma'am." Earlier, Appellant stated he would take care of the children like he has done since they were born. The caseworker testified his response demonstrates that he does not understand the children's special needs or the care the children need.

### D. Plans for the Children

Appellant did not have a support system to assist him in caring for the children when he was arrested. During the pendency of the case, Appellant did not develop a support system. Instead, Appellant testified he planned to move to California if the children were returned to his care because he had family in California who would assist him. The Department's investigator testified Appellant never mentioned any family in California to her, and the caseworker testified she was surprised by his testimony. Although Appellant was seventy-seven years old, he could not recall the last time he saw a doctor and was unable to provide the Department with any meaningful health information.

Since the children have been in the Department's care, they have improved. Ruth's temper tantrums have improved, and her maturity level has increased from a five-year-old to a seven-year-old. However, Ruth continues to struggle with attention-seeking behaviors and harming herself by picking at the skin around her nails until it bleeds. John has also improved. In December of 2016, his level of care was decreased from intense to specialized, allowing him to be moved to a home-based residential treatment facility. Although John was initially overweight, his last physical revealed he is physically on target. When the caseworker visited with John the week before trial, he was not defiant or aggressive, but was polite and well-behaved.

The Department's plan was to place John with Ruth in the foster home where Ruth had lived since her removal. Because John's condition had sufficiently stabilized, the Department's goal was to transition John to the foster home before the school year begins. The caseworker testified the foster mother is "on board" with John transitioning to her home. The foster mother is committed to keeping the children long-term but had not committed to adopting them.

Viewing the evidence in the light most favorable to the jury's verdict, we hold the evidence is legally sufficient to support the jury's finding that termination was in the best interest of the children.

## JURY CHARGE

In his second issue, Appellant contends the trial court abused its discretion in failing to include an instruction in the jury charge "stat[ing] that the Department could have been named as the Permanent Managing Conservator of the children … [as] an alternative other than just termination of [Appellant's] parental rights." The Department responds the trial court submitted the controlling question of whether Appellant's parental rights should be terminated in the form approved by the Texas Supreme Court in *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 648-49 (Tex. 1990). Because the jury charge properly submitted the controlling question, the trial court did not abuse its discretion in refusing to submit the requested instruction. *See In re A.W.*, No. 05-13-01674-CV, 2014 WL 1410545, at *2 (Tex. App.—Dallas Apr. 10, 2014, pet. denied) (holding trial court does not abuse its discretion in refusing to submit issue regarding conservatorship where trial court submits controlling question of whether the parent's rights should be terminated); *Ayala v. Tex. Dep't of Family & Protective Servs.*, No. 03-09-00121-CV, 2010 WL 3672351, at *4 (Tex. App.—Austin Sept. 16, 2010, no pet.) (same). Furthermore, given the jury's affirmative findings under section 161.001(b), we cannot say Appellant was harmed by the trial court's refusal. *See* TEX. R. APP. P. 44.1(a) (the omission of an instruction is reversible

error if the omission probably caused the rendition of an improper judgment).  Accordingly, we overrule Appellant's second issue.

### CONCLUSION

The trial court's order is affirmed.

Sandee Bryan Marion, Chief Justice