# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-21-00174-CV

### T. M. and O. A., Appellants

### v.

### Texas Department of Family and Protective Services, Appellee

### FROM THE 207TH DISTRICT COURT OF HAYS COUNTY
### NO. 20-0618, THE HONORABLE WILLIAM R. HENRY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

T.M. (Mother) and O.A. (Father) appeal from the trial court's order terminating their parental rights to their children E.A. (Daughter), born September 23, 2013, and T.A. (Son), born December 19, 2014. The trial court found that termination was in the children's best interest and that both parents had: (1) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children, (2) constructively abandoned the children, and (3) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the children. *See* Tex. Fam. Code § 161.001(b)(1)(E), (N), (O), (2). Mother and Father appeal from the trial court's findings related to statutory grounds and best interest and challenge the court's appointment of the Texas Department of Family and Protective Services as the children's permanent managing conservator.

As explained below, we conclude that the evidence is factually insufficient to support the trial court's findings as to subsection (E), and we therefore delete the order's findings of statutory grounds under subsections (E). However, because we conclude that the evidence is legally and factually sufficient to support its findings as to (O) and as to best interest, we affirm the trial court's order terminating Mother and Father's parental rights. We further affirm the portion of the order appointing the Department as the children's managing conservator.

## PROCEDURAL AND FACTUAL SUMMARY

The Department sought conservatorship of the children March 10, 2020. Mother appeared and an attorney was appointed to represent her at a March 20, 2020 status conference. In July, Father was served with citation through substitute service after an investigator with the Hays County District Attorney's Office provided an affidavit describing her attempts to serve Father starting May 11 and opining that she believed Father was avoiding service, was "aware of the service attempts[,] and [had] not made any attempts to accept service." He was notified of but did not appear at a permanency hearing on September 2, and his attorney was appointed on December 4. The final hearing began on January 27, 2021, and after Department caseworker Judi Webster testified, the trial court continued the hearing to March 18.[1]

The Department introduced into evidence Mother's and Father's family-service plans, which were filed with the trial court on April 10, 2020; the results of Mother's March 6, 2020 drug test; a status hearing order signed by the trial court on May 8, 2020; an order for substituted service of Father signed July 8, 2020; proof of service showing Father was served on

---

[1] The trial was held via video conference due to COVID-19 restrictions. *See* Supreme Court of Texas's Second Emergency Order Regarding the COVID-19 State of Disaster (Misc. Docket No. 20-9043) and all subsequent Orders.

July 13, 2020; and the court's initial permanency hearing order signed September 2, 2020. Mother's drug test results show that she tested at a level of 1436 for methamphetamine, well beyond the levels necessary to indicate a positive result. In its May 8 Status Hearing Order, the trial court noted that Mother had appeared with her attorney and that Father had not been notified and ordered that the parents' visitation plans and Mother's family-service plan were made orders of the court. In its September 2 Initial Permanency Hearing Order, the trial court found that Mother had appeared with her attorney, that Father had been notified but did not appear, and that neither parent had demonstrated adequate and appropriate compliance with their service plan. It ordered that Father's family-service plan was made an order of the court, that the parents' visitation should be stopped, and that, "If no additional services are engaged in, the Department is to proceed with trial at the next setting." The parents' service plans have virtually identical requirements, requiring each parent to obtain and maintain housing appropriate for the parent and the children, avoid criminal activity and associating with known criminals, obtain and maintain employment, complete a "psycho-social" evaluation and follow all recommendations, maintain monthly contact with their caseworker, successfully complete individual therapy, complete a drug and alcohol assessment and follow all recommendations, submit to random drug tests at the Department's request, and complete a parenting class. Mother was also ordered to complete a psychological evaluation and follow all recommendations.

Caseworker Webster testified that the Department removed the children because Mother tested positive for methamphetamine. She also testified that at the time the children were removed, Mother was homeless, and they were staying with friends after having lived in a shelter. Webster testified about the parents' family-service plans and said that neither parent had complied with their respective plan.

3

Webster testified that she first contacted Mother in mid-March 2020 to arrange for drug testing, and Webster's records "show we had one result." Asked whether she was "aware of whether [Mother] tested after that point," and Webster answered, "After the first one, no, sir." She further testified that Mother was referred for a hair-follicle test but "did not show for the test." Mother was homeless when the case began, and Webster assumed at times during the proceeding that Mother was living in her car because Mother never had a physical address and attended some of her virtual visitations from a car. Mother told Webster at one point that it "wasn't safe to get her mail at the address she was at," so Webster asked Mother to provide an address where she could get mail. Mother never provided that information, so Webster instead sent Mother her visitation and family service plans via email. Webster said that Mother did not make her aware of any issues with Mother's phone or with finding an internet connection, although Webster recalled Mother saying once that "she got better reception outside" and another time that she was having car problems. Mother never told Webster that she was "having issues with any of her services," nor did she ever report that she had found a job or a place to live. Mother also failed to maintain regular contact with Webster, and Webster said that throughout the case, she had reached out to Mother once or twice a month and would remind Mother about drug testing and "that providers had been reaching out to her to set up services."

Webster testified that she first made contact with Father at the beginning of April 2020, when she sent him a link to access a hearing and a drug-test request—Father never took that drug test. Father told Webster that before the case began, he last had visitation with his children "sometime in 2019, but he wasn't specific of what—exactly when." On April 7, Webster sent Father his visitation plan, which he acknowledged receiving. In early May, Webster sent Father his family-service plan and an access link for another hearing and informed

4

him that she was trying to serve him with citation. She testified that she had continued to reach out to Father, "[p]robably once or twice a month," "through text messages and calling his phone about—seeing about services and to see how—or to set up our monthly meetings with him." However, Webster had never been to Father's home or tried to visit it. Webster was asked whether Father had taken any drug tests, and she answered, "To my knowledge, no, sir." She also testified that she had "not been informed" that Father had ever said he uses drugs.

Mother and Father had been allowed virtual visits with the children every other week until the court ordered visitation stopped in September after finding that the parents had not made sufficient progress on their service plans. Webster characterized the parents' visitations as "sporadic." She said that "[i]n the beginning, Mom was doing visitation well" and "was reaching out to the children," and that the children acted happy to see Mother and were as affectionate as they could be in a virtual visit. However, Mother started to miss one or two visits, which amounted to "a whole month because they were only getting two visits a month, per [the] visitation plan." Although Webster did not have the "total number" of visits Mother had missed, she said it was "like, months in a row, she would miss visitations with the children." Similarly, Father also started out making at least one of his visitations every month but then started missing every other visit, and toward the end of the summer, Father had one visit in early August and "quit visits after that."

As for potential placements for the children, Mother had proposed her mother (Grandmother) as a potential placement, but Webster testified that Grandmother "did not want to be a placement for the children." Webster said that Father never returned a form listing potential placements for the children but that his sister (Aunt) contacted Webster in July or August seeking visitation with the children. However, Webster testified that Aunt "did not mention

5

placement at that time" and said only "that she wanted to be able to talk to them on the phone." Webster informed Aunt that because she "was not a legal party" to the case, she would have to talk to Father to obtain details about the case. Webster said she had not initiated a home study after speaking to Aunt on August 31 because she was waiting for Aunt to start the process. She also testified that Aunt texted in September to say the children "had lots of family" in California and that she and her family would like to be their placement and that she continued to text to inquire about being the children's placement through January 2021. However, Webster had not contacted anyone in California to learn about Aunt's home study and did not know whether Aunt had begun the process of being approved for placement in California. Finally, Webster said she could not remember whether the Department had gotten a recommendation from the children's therapist as to whether termination was in their best interest.

Department caseworker Cindy Doyle was assigned as Father's courtesy caseworker in April 2020 and first made contact with him on May 28, 2020, when he responded to an email she had sent in mid-April. Doyle attempted to set up a psychological evaluation for Father and asked him to send a signed release form, which she received months later, in October. In early September, Father asked if he could meet with Doyle in person, but she said it would have to be via videocall because of COVID-19. Doyle reported that Father did not reach out again until the end of September, when he texted to say "that he was told that I was his caseworker and that he should speak to me about starting classes." Doyle testified that she communicated with Father through October and that she sent him a referral for a second provider to conduct a psychological evaluation and for a drug and alcohol assessment. However, the providers later told Doyle that they had been unable to contact Father. In January 2021, Doyle tried to make in-person contact with Father, going to the address the Department had on record,

6

but Father was not there. On March 7, he emailed Doyle his current address and a new phone number. Doyle did not remember Father ever telling her that he was living with and caring for his mother or that his mother had cancer. Doyle also did not recall if Father had been ordered to take drug tests and did not think he had ever taken any such tests. To Doyle's knowledge, Father had not completed any of his required services by the time of the March hearing.

Father testified and denied using any illegal drugs other than smoking marijuana when he was "younger," saying he had last used marijuana about four years earlier. Although his service plan states that he had "admitted to doing Methamphetamine a month ago," Father denied making that statement. He also testified that he did not know he had been ordered to take drug tests. Father knew he had been ordered to maintain stable housing and said he had done so in December 2020. He acknowledged that he had not completed a psychosocial evaluation, saying that he did not have transportation on the day he was supposed to go, that he rescheduled his appointment for the next week but "didn't end up going after all," and that he never tried to reschedule again after that. He also knew that he had been required to complete a drug and alcohol assessment and said he did not take the assessment because he was supposed to get dates for that service after he completed the psychosocial evaluation, which he never took. Finally, he admitted that he had been ordered to take a parenting class but had not done so. Father said that he had suggested both Aunt and his ex-wife as possible placements, that the children's half-siblings live with his ex-wife, and that the children and Aunt's children "know each other."

Father testified that when the proceeding started, he was living with and caring for his mother, who had cancer and who died in early August. Father believed that if he had more time, he would have worked hard and completed his services, but admitted that he had not engaged in services in the seven months between his mother's death and the March hearing.

7

In her testimony, Mother admitted that she had not maintained monthly contact with Webster but asserted that she had tried to do so and had issues in contacting Webster, who did not always return Mother's calls or texts. Mother testified inconsistently about when she received her service plan, saying both that she had asked Webster at least five times for the service plan but "did not receive it" until the day before the March hearing and that she received emails with her service plan "a couple times" during the proceeding. Mother testified that she had printed and read through the document the day before the March hearing. Mother said that during the time she was allowed visitation, she tried to visit the children "[e]very chance [she] could" but she sometimes had difficulties contacting Webster to get the visitation link or issues with her phone, which would freeze or lose signal during a visit. Mother insisted that she had told Webster about those technical difficulties.

Mother said that she had found stable housing after working toward that goal "this entire time" and had obtained employment about six months earlier. Mother acknowledged that she had been ordered to complete a psychological evaluation and had not done so, testifying, "I just received information yesterday," and asserting that Webster never gave her referrals for an evaluation. Mother also admitted that she had tested positive for drug use, that she had been ordered to take random drugs tests but "never went back and completed any more drug screens," and that she had been ordered to complete a drug and alcohol assessment but had not done so because she "did not know who to contact." Mother was asked about the court-ordered parenting class and said that she had "been looking up which ones to take." She testified that until the hearing, the document listed "a whole slew of different kinds of classes," but "as of yesterday, [she] found out which one [she] needed to take" and was "in the process of" completing it. Mother believed that since she had obtained housing and employment, she would be able to

8

successfully pursue the other required services if she had more time. Mother said, "I know I haven't showed much progression in this case. I haven't been in a right state of mind mentally or emotionally," explaining that she had been feeling depressed due to losing custody of the children, the deaths of several family members, and the pandemic.

The trial court appointed CASA of Central Texas as the children's guardian ad litem, and Lonette LaBorde, the children's CASA supervisor, testified that they were placed in a foster home and "doing really, really well." She said they had made "great strides academically and therapeutically, emotionally." The children were very bonded to their foster parents, had "developed a good trusting relationship" with them, and enjoyed activities with them and with the foster parents' extended family. LaBorde testified that the children's therapist thought it "would be very traumatizing to the children" to talk to the children about their family, including the fact that they had half-siblings, and that CASA had had "pretty regular contact" with Aunt but had followed the therapist's recommendation not to ask the children about her or their other relatives. CASA's concerns were that Mother "had not made any progress with any services" by mid-October and that Father had not started any services and did not have a stable home by December. As far as LaBorde knew, neither parent had made any progress since then, and LaBorde testified that CASA believed that it was in the children's best interest for their parents' rights to be terminated. She said, "It's important for them to be able to move on."

Aunt testified that she contacted the Department to ask to be considered as a placement for the children when she first heard in March 2020 that the children had been taken into the Department's care. She said she made it clear that she was ready to "do anything for [the children] if they needed us." Webster called in November to ask if Aunt "wanted to be a placement," so Aunt and her family bought a bigger vehicle, "rearranged our household," and

9

started the process of being licensed in California as a placement. Aunt also said she had sent CASA and the Department letters and pictures to give to the children and had sent the Department videos of her having video chats with the children "to show that we did have a relationship with them prior." However, the children's attorney ad litem told the trial court that after the January hearing, he spoke to the children about their relationship with Aunt and their wishes. Both children said they do not know Aunt and do not want to live with her, Son "wants to be adopted" by his foster parents, and Daughter "wants to go back and live with her mother."

At the conclusion of the hearing, the trial court found that termination of Mother's and Father's parental rights was warranted under subsections (E), (N), and (O) and was in the children's best interest. The court noted that it had "built in" a continuance requested by Father when it set the March hearing date nearly two months after the first day of testimony and said:

> [Mother and Father] had almost two months from our last hearing when trial began to today. And the writing was on the wall in January. And if your clients could have read that writing, I think they could have gone a great distance to resolve the issues. But they didn't. I know COVID is out there. I know COVID has caused a lot of issues for a lot of people. . . . It's somewhat mitigating to a point. But to simply not contact your caseworker; to simply not show up for drug screens; to simply not go to your visits; to simply not do a psychological evaluation; to simply not do any of the other services that the Court has ordered is not acceptable. You can't blame that on COVID.

## STANDARD OF REVIEW

To terminate a parent's rights to their child, the Department must prove by clear and convincing evidence that the parent engaged in conduct that amounts to at least one statutory ground for termination pursuant to section 161.001 and that termination is in the child's best interest. Tex. Fam. Code § 161.001(b); *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam); *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014). Clear and convincing evidence is "the

10

measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). We defer to the decisions of the factfinder, which, "having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *A.C.*, 560 S.W.3d at 630. In reviewing legal sufficiency, we view the evidence in the light most favorable to the factfinder's determination, including undisputed contrary evidence, and assume the factfinder resolved disputed facts in favor of its finding. *Id*. at 630-31. If the factfinder could have formed a firm belief or conviction that the finding was true, the evidence is legally sufficient. *Id*. at 631. In reviewing factual sufficiency, we weigh the disputed evidence contrary to the finding against all the evidence favoring the finding and ask whether the disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding. *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id*.

## DISCUSSION

Mother and Father both assert five issues on appeal, challenging the trial court's findings of statutory grounds for termination, its finding that termination was in the children's best interest, and its decision to appoint the Department as the children's managing conservator.

11

We will first consider whether the evidence is sufficient to support the court's finding of statutory grounds, beginning with its finding under subsection (E). *See N.G.*, 577 S.W.3d at 237.

### *Subsection (E), endangerment*

Termination may be ordered under subsection (E) if the evidence establishes that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(E). "[T]he relevant inquiry is whether evidence exists that the endangerment of the child's physical and emotional well-being was the result of the parent's conduct, including acts and omissions or failures to act." *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 699 (Tex. App.—Austin 2019, pet. denied) (quoting *Asjes v. Texas Dep't of Protective & Regul. Servs.*, 142 S.W.3d 363, 370 (Tex. App.—El Paso 2004, no pet.)). "Endangerment does not need to be established as an independent proposition but may be inferred from parental misconduct," meaning the Department does not have to prove that the parent's misconduct was directed at the child or that the child suffered an actual injury. *Id.* (citing *Texas Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)); *see In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012). Termination under subsection (E) requires more than a single act or omission, and the Department must show a voluntary, deliberate, and conscious course of conduct by the parent, considering a parent's actions both before and after the child was removed from the home. *E.E. v. Texas Dep't of Fam. & Protective Servs.*, 598 S.W.3d 389, 405 (Tex. App.—Austin 2020, no pet.).

"As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *J.G. v. Texas Dep't of*

12

*Fam. & Protective Servs.*, 592 S.W.3d 515, 524 (Tex. App.—Austin 2019, no pet.) (quoting *In re J.O.A.*, 283 S.W.3d 336, 345 n.4 (Tex. 2009)).  Thus, "a parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct."  *J.O.A.,* 283 S.W.3d at 345.[2]  This is because illegal drug use exposes children to the possibility that their parents could be impaired or imprisoned, which would endanger the children's physical and emotional well-being.  *See A.C.*, 577 S.W.3d at 699.  And when the record contains evidence of a parent's drug use "'during the pendency of a termination suit, when he knows he is at risk of losing his children,' such evidence has been found legally sufficient to support a finding of endangerment under subsection (E)."  *In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied) (quoting *In re D.D.M.*, No. 01-18-01033-CV, 2019 WL 2939259, at *4 (Tex. App.—Houston [1st Dist.] July 9, 2019, no pet.) (mem. op.); *see In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied) (stability and permanence are of paramount

---

[2] Mother cites *In re L.C.L.*, 599 S.W.3d 79 (Tex. App.—Houston [14th Dist.], pet. denied) (en banc), to support her argument that the Department did not show a causal link between her drug use and the children's endangerment.  Although we agree that a parent's drug use does not on its own *automatically* equate to endangerment, *see In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied), it is not hard to imagine a case in which a parent's drug use might be so pervasive or serious, even in the absence of evidence of conduct that directly endangers the child or limited to times when the child was not in the parent's direct care, that the drug use on its own could support a finding of endangerment.

Importantly, in an opinion concurring with the denial of the Department's petition for review, Justice Lehrmann noted a split in the courts of appeals and seemed to caution the lower courts against attempting to make blanket rules about the sufficiency of evidence.  *In re L.C.L.*, __ S.W.3d __, No. 20-0432, 2021 WL 2603699, at *2 (Tex. June 25, 2021) (Lehrmann, J., concurring).  Justice Lehrmann noted a recent supreme court case reaffirming that endangering conduct under subsection (E) need not be directed at the child or cause the child to suffer actual injury.  *Id.* (quoting *In re J.F.-G.*, 627 S.W.3d 304, 312-313 (Tex. 2021)).  She acknowledged that "mere imprisonment," which she said was "akin to" "mere drug use" cannot *on its own* support an endangerment finding but noted that "just as imprisonment cannot be viewed in a vacuum, neither can a parent's drug use."  *Id.* (citing *Texas Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533-34 (Tex. 1987)).

importance in termination case, and parent's decision to use drugs during pendency of termination proceeding, when parent is at risk of losing child, supports a finding that parent engaged in conduct that endangered child's well-being); *Cervantes-Peterson v. Texas Dep't of Fam. & Protective Servs.*, 221 S.W.3d 244, 253 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (in finding sufficient evidence of endangerment, appellate court noted that mother's drug use continued after child's removal, "in the face of periodic narcotics tests that placed her relationship with her child in jeopardy").

The Department presented evidence that at the time the children were removed, Mother had tested positive for methamphetamine, she was homeless at the time and had left the shelter she and the children had been living in, and Father admitted to using methamphetamine about a month earlier and had not seen the children since 2019. Further, the Department presented evidence that neither parent took any drug tests during the case, resulting in a presumption that the parents would have tested positive for drug use, *see J.K. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-18-00814-CV, 2019 WL 1646268, at *2 (Tex. App.—Austin Apr. 17, 2019, pet. denied) (mem. op.); *In re E.M.*, 494 S.W.3d 209, 222 (Tex. App.—Waco 2015, pet. denied); informed the Department that they had obtained employment or stable housing; or completed their required parenting class, psychological evaluation, or drug and alcohol assessment. Given the instability of Mother's and the children's living environment, Mother's initial drug test results and Father's alleged admission that he had used methamphetamine shortly before the children were removed, both parents' missing at least one drug test during the pendency of the proceeding, Father's apparent lack of involvement with the family when the children were removed, the parents' failure to act on the court orders or Department requests, and the uncertainty that the parents' conduct caused in the children's lives,

14

we conclude that legally sufficient evidence supports the trial court's finding of grounds under subsection (E).

We cannot, however, conclude that the evidence is factually sufficient to support termination under subsection (E) as to either parent. We have little evidence in this record beyond the fact that Mother tested positive for methamphetamine, resulting in the children's removal, and that she and Father missed some unknown number of drug tests[3] and failed to engage in services. However, "a finding of endangerment based on drug use alone is not automatic." *C.V.L.*, 591 S.W.3d at 751. Instead, the Department must still present clear and convincing evidence of "a continuing course of conduct to satisfy the requirements of subsection (E)." *Id*.

As far as Mother's conduct is concerned, the Department did not present evidence about why Mother was asked to take her initial failed drug test, such as concerns about how she was caring for the children or that the children were dirty or malnourished, had missed school, or the like. Nor did it present evidence as to the extent or duration of Mother's drug use, whether she had used drugs while caring for the children, whether the children had any awareness of her drug use, whether her drug use had ever exposed them to dangerous individuals or circumstances, whether she had faced criminal charges or incarceration at any point, or even about the Department's general concerns about methamphetamine use and its possible effects on a person's ability to care for her children. As for Mother's homelessness, the Department did not present any evidence about her and the children's circumstances beyond the fact that they were

---

[3] Although Mother acknowledged that she knew she had been ordered to submit to random drug screenings and had not done so, the Department did not present evidence as to how many tests had been requested of her. The Department only established that Father missed one drug test, in April 2020, and did not present evidence that any other tests were requested of him.

experiencing homelessness when the children were removed—there was no evidence about how long the family had been homeless, about the shelter in which they had stayed, when or why they left the shelter, or where they were living after leaving the shelter.

Given the paucity of evidence presented by the Department—which amounted to establishing that the children were removed because Mother was homeless and had failed an initial drug test, that she missed some unknown number of drug tests, and that she failed to engage in services—we cannot conclude that the evidence is factually sufficient to support a finding of a "voluntary, deliberate, and conscious course of conduct" by Mother that can be viewed as having endangered the children.

The Department similarly failed to present factually sufficient evidence establishing that Father had engaged in a voluntary, deliberate, and conscious course of conduct that endangered the children. Father admitted to using marijuana but testified that he last used it four years before trial and denied using any other illegal drugs. The only evidence of such use was a single assertion in Father's service plan that he had admitted to using methamphetamine a month earlier, a statement that Father denied making and that Webster testified she was unaware of. Further, the children were not in Father's care during the time in which he allegedly admitted to using methamphetamine, and there was no evidence that he had left the children in Mother's care at a time when she was using methamphetamine or that he was aware of any drug use by Mother. Indeed, there was no evidence about Father's circumstances or his involvement with the family at the onset of the case other than Webster's testimony that he told her he had last seen the children at some undefined time in 2019. Finally, although Father did not take the initial drug screen requested by Webster in April 2020, before he was served and before his service

16

plan was made an order of the court, the record does not indicate that any other drug tests were requested of him.[4]

On this record, we conclude that the evidence is legally sufficient but factually insufficient to support the trial court's finding that either Mother or Father engaged in a "voluntary, deliberate, and conscious course of conduct" that endangered the children's physical or emotional well-being. We sustain Mother's and Father's first issue in part.

### Subsection (O), compliance with family-service plans

To terminate parental rights under subsection (O), the Department must show by clear and convincing evidence that (1) the child was removed under Chapter 262 of the Texas Family Code for abuse or neglect, (2) the child has been in the conservatorship of the Department for at least nine months, and (3) the parent "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain return of the child." *See* Tex. Fam. Code § 161.001(b)(1)(O). On appeal, Mother and Father argue that there is insufficient evidence that the children were removed for "abuse or neglect."

Whether a child was removed for abuse or neglect is a fact-specific inquiry. *See S.M.R.*, 434 S.W.3d at 583; *D.F. v. Texas Dep't of Fam. & Protective Servs.*, 393 S.W.3d 821, 830 (Tex. App.—El Paso 2012, no pet.). Chapter 262 does not define the phrase "abuse or neglect," but the supreme court has explained that the phrase is "used broadly" and not limited to allegations of actual abuse or neglect inflicted on a child. *In re E.C.R.*, 402 S.W.3d 239, 246 (Tex. 2013). Instead, because chapter 262 uses the standard of "danger to the physical health or

---

[4] According to the November 2020 permanency report, "Due to the [D]epartment not [being] able to contact [Father,] other drug referrals were not able to be placed." However, both Webster and Doyle communicated with Father throughout the case.

17

safety of the child," a phrase "centered on risk, rather than just a history of actual abuse or neglect," abuse or neglect "necessarily includes the risks or threats of the environment in which the child is placed." *Id*. at 247-48.

As with its assertions of endangerment, the Department presented little evidence that the children were removed for abuse or neglect. Webster testified that the children were removed after Mother tested positive for methamphetamine and that the Department had concerns about her homelessness, but there was no evidence about the extent of Mother's drug use or the family's living situation at the time of removal. However, the trial court's temporary orders provide additional support for a finding of removal for neglect.[5] In its March 10 order allowing the Department to take emergency custody of the children, the trial court found that there was "an immediate danger to the physical health or safety of the children" and that their "continuation in the home of [the parents] would be contrary to the children's welfare." On March 20, the court signed an order extending the March 10 order, finding that it was in the children's best interest for the Department to continue as temporary managing conservator and that the children will suffer "immediate and irreparable injury, loss, or damage" if the emergency orders were not extended. And in its temporary order signed on April 2, 2020, after a full

---

[5] Although a trial court may not take judicial notice of the truth of allegations contained in its records, it may take judicial notice of its earlier orders or findings of fact. *See C.S. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-17-00229-CV, 2017 WL 3471072, at *3 (Tex. App.—Austin Aug. 9, 2017, no pet.) (mem. op.); *Tschirhart v. Tschirhart*, 876 S.W.2d 507, 508 (Tex. App.—Austin 1994, no writ). Indeed, a trial court is "presumed to have taken notice of its own records in a case because '[a] trial judge judicially knows what has previously taken place in the case on trial.'" *Asplundh Tree Expert Co. v. Abshire*, 517 S.W.3d 320, 344 n.13 (Tex. App.—Austin 2017, no pet.) (quoting *Estate of Hoskins*, 501 S.W.3d 295, 310 (Tex. App.—Corpus Christi 2016, no pet.)); *see also In re J.E.H.*, 384 S.W.3d 864, 869-70 (Tex. App.—San Antonio 2012, no pet.) (if record is silent, "the trial court may be presumed to have taken judicial notice of the records in the court's file without any request being made and without an announcement in the record that it has done so"). We note that in this case, the same trial court judge signed all but the first March 10 order.

adversarial hearing held pursuant to section 262.201,[6] the trial court stated that it found sufficient evidence that there was "a continuing danger to the [children's] physical health or safety" caused by an act or failure to act by the parents and that "continuation of the child[ren] in the home would be contrary to the child[ren]'s welfare."

The trial court found that the children should be removed due to a risk of immediate and irreparable harm and that their removal should be extended due to a "continuing danger" to their physical health or safety, and the Department presented evidence that the family was homeless and in unstable circumstances when the children were removed and that Mother had used methamphetamine while charged with caring for the children. We therefore conclude that the evidence is legally and factually sufficient to support an implied finding that the children were removed due to abuse or neglect. *See In re A.A.A.*, 265 S.W.3d 507, 516 (Tex. App.— Houston [1st Dist.] 2008, pet. denied) (child was removed on emergency basis after mother was arrested for shoplifting after leaving child at shelter, and trial court issued temporary order finding continuing danger to child's physical health or safety if returned to mother; court of appeals held that evidence was legally sufficient to support finding that child was removed for neglect and that, given evidence of mother's lack of effort to find child after mother was released, evidence was factually sufficient to support same finding); *see also D.F. v. Texas Dep't*

---

[6] Under section 262.201, the trial court must hold a full adversarial hearing soon after the child is taken into the Department's custody and must order the child returned unless it finds sufficient evidence that "there was a danger to the physical health or safety of the child, including a danger that the child would be a victim of trafficking," "caused by an act or failure to act of the person entitled to possession and for the child to remain in the home is contrary to the welfare of the child"; that "the urgent need for protection required the immediate removal of the child and reasonable efforts, consistent with the circumstances and providing for the safety of the child, were made to eliminate or prevent the child's removal"; and that "reasonable efforts have been made to enable the child to return home, but there is a substantial risk of a continuing danger if the child is returned home." *See* Tex. Fam. Code § 262.201(a), (e), (g).

19

*of Fam. & Protective Servs.*, 393 S.W.3d 821, 831 (Tex. App.—El Paso 2012, no pet.) (finding sufficient evidence of removal for abuse or neglect in part because trial court entered emergency order of removal finding immediate danger to child's health or safety); *In re S.N.*, 287 S.W.3d 183, 190 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (same).

The parents do not dispute that they failed to comply with the requirements of their court-ordered service plans, which established the steps necessary to regain custody of the children, and the record establishes that fact. Because the evidence is sufficient to support the finding that removal was due to abuse or neglect, the evidence is legally and factually sufficient to support the trial court's finding of statutory grounds under subsection (O). We overrule Mother's and Father's third issue.[7]

### Best interest

We review a trial court's finding of best interest in light of the factors set out in *Holley v. Adams*: the child's wishes, if appropriate given the child's age; the child's emotional and physical needs now and in the future; present and future emotional or physical danger posed to the child; the parenting skills of those seeking custody; any programs available to assist those seeking custody to promote the child's best interest; plans for the child's future; the stability of the home or proposed placement; conduct by the parent that might show that the parent-child relationship is inappropriate; and any excuses for the parent's conduct. 544 S.W.2d 367, 371-72 (Tex. 1976). The *Holley* factors are not exhaustive, not all factors must be proved, and a lack of

---

[7] Because we have found legally and factually sufficient evidence to support one statutory ground for termination, we need not consider their second issue, challenging the court's finding of grounds under subsection (N). *See Spurck v. Texas Dep't of Fam. & Protective Servs.*, 396 S.W.3d 205, 222 (Tex. App.—Austin 2013, no pet.) ("Having determined that the evidence is sufficient to support the jury's finding on one of the statutory grounds, we need not consider whether the evidence would support other grounds for termination.").

evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence [was] undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

Mother tested positive for methamphetamine at the beginning of the case, never took further drugs tests, and did not attempt to address her drug problem or even have it assessed. Father admitted to having used marijuana but never took drug tests or completed an assessment to determine whether he had any dependency issues that needed to be addressed. Further, Father seems to have had little, if any, contact with his children for at least several months before the children were removed. Mother was homeless when the children were removed, and although she testified that she had obtained stable housing at some point during the proceeding, she did not provide any information about her housing to the Department or in her testimony. Father had been living with his ill mother until August and testified that he had obtained a stable place to live in December, but he did not tell the Department his new address until about two weeks before the March hearing. The Department therefore had not been able to verify the stability or appropriateness of the parents' respective housing arrangements.

Both parents started out with fairly regular visitations but then began to miss frequently through the summer. Neither parent availed themselves of any of the court-ordered services that might have helped address the Department's concerns, assisted the parents in regaining custody, or addressed any mental health or dependency issues. Their visitations were stopped in September after they both failed to make progress on any of their court-ordered services, and neither parent took any action after that point to regain visitation. Indeed, despite being cautioned by the trial court at the end of the January hearing that "if you cannot or will not

21

provide a safe and stable home for your children, your rights may be restricted or terminated," neither parent took any action in the two months between the hearing dates that might indicate they were able to provide a safe, stable home for the children or that they were trying to do so.

Mother asserted that she had not received a copy of her family service plan until shortly before the March hearing but also testified that she had received her service plan earlier but had not found a way to print it until just before the hearing, and Webster testified that they had discussed the plan repeatedly. Mother claimed difficulty in contacting Webster, but Webster testified to the contrary, saying that she had repeatedly reached out to Mother and that Mother never said she was having difficulty arranging services or with technology. Doyle testified that she tried to work with Father and that he was not very responsive and did not avail himself of any of the services she tried to arrange. LaBorde similarly testified that she and others at CASA had "attempted contact with the parents consistently" since CASA's assignment but that it "appears that neither parent has really made an effort to complete any part of their plan."

The children had been in the same foster home since their removal, they were well-bonded to their foster parents and thriving in the placement, and they had made "great strides" in school and through therapy. There was no testimony that either child has physical or mental disabilities or vulnerabilities, but the children's therapist told the guardian ad litem that it would be "very traumatizing" to ask them about the proceeding or their relatives. LaBorde testified that the children's foster parents hope to adopt them and that she believed it was in the children's best interest for the parents' rights to be terminated so the children could have "a stable forever family," and the children's attorney ad litem agreed. Son, who was six at the time of the hearing, told his attorney ad litem that he wanted to be adopted by his foster placement, while Daughter, who was seven, said she wanted to return to Mother's care. However, there is

22

no evidence that the children were mature enough to express such preferences or that their wishes should be given significant weight. *See In re D.W.*, 445 S.W.3d 913, 926 (Tex. App.—Dallas 2014, pet. denied) ("a child's preference should not be considered absent a showing of sufficient maturity"); *In re A.R.*, 236 S.W.3d 460, 480 (Tex. App.—Dallas 2007, no pet.) ("There was no indication the child was sufficiently mature to express a parental preference, and the court was not required to consider the wishes of the child."); *see also* Tex. Fam. Code §§ 153.134(a)(6) (allowing trial court in non-termination context to consider child's wishes if child is at least twelve years old), 156.101(a)(2) (same).

Having considered all of the evidence presented at the final hearing and weighed it in light of the *Holley* factors, we hold that legally and factually sufficient evidence supports the trial court's finding that termination of the parents' rights was in the children's best interest. We overrule Mother's and Father's fourth issue.

*Conservatorship*

In their fifth issue, Mother and Father challenge the trial court's appointment of the Department as the children's sole managing conservator, arguing that the Department did not overcome the presumption that the appointment of a child's parents as joint managing conservators is in the best interest of the child. *See* Tex. Fam. Code § 153.131. However, that presumption disappears when a parent's rights to their child have been terminated. *See T.J. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-14-00351-CV, 2014 WL 6845198, at *5 (Tex. App.—Austin Nov. 25, 2014, no pet.) (mem. op.); *Spurck v. Texas Dep't of Fam. & Protective Servs.*, 396 S.W.3d 205, 219-20 (Tex. App.—Austin 2013, no pet.); *In re D.O.*, 338 S.W.3d 29, 38-39 (Tex. App.—Eastland 2011, no pet.). We overrule the parents' fifth issue.

**CONCLUSION**

We affirm the trial court's order terminating Mother's and Father's parental rights under subsection (O) and appointing the Department as permanent managing conservator of the children. However, we reverse the portion of the judgment finding statutory grounds under subsection (E) and remand for further proceedings as to that subsection. *See In re J.O.A.*, 418 S.W.3d 625, 626 (Tex. App.—Amarillo 2009, no pet.) (op. on remand) ("remand is the appropriate judgment when evidence is found to have been legally sufficient, but factually insufficient"). If the matter is retried, the trial court is instructed to commence the trial no later than 180 days after mandate is issued by this Court. *See* Tex. R. App. P. 28.4(c).

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Triana and Kelly
   Concurring and Dissenting Opinion by Justice Triana

Affirmed in Part; Reversed and Remanded in Part

Filed: October 8, 2021

24