

# NUMBER 13-22-00131-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF J.J.M., ET AL., CHILDREN

### On appeal from the County Court at Law No. 5
### of Nueces County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Tijerina**
**Memorandum Opinion by Justice Tijerina**

Appellant L.M. (Mother) appeals the termination of her parental rights to her two children, J.J.M.[1] (J.M.) and E.M. By three issues, Mother argues: (1) the trial court lacked jurisdiction; (2) the evidence was insufficient to terminate Mother's parental rights; and (3) it was not in the best interest of the children to terminate Mother's parental rights. We affirm.

---

[1] We use initials to protect the identity of the children. *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

# I.    PERTINENT FACTS

J.M. was born July 3, 2012, and E.M. was born on January 3, 2014. On September 26, 2019, appellee the Texas Department of Family and Protective Services (the Department) filed a petition to terminate the parents' rights of Mother and Father.[2] The Department received reports regarding allegations of neglectful supervision; physical abuse of both children, which left marks and "deep" bruises; ongoing drug use and alcohol abuse by Father and Mother; failure to seek care and treatment for the children's mental health issues; Father sleeping in his car with the children while under the influence of drugs; the children being filthy and not bathed; and J.M. being significantly behind in school. Trial commenced on March 5, 2021, but it was recessed until August 18, 2021. At that time, J.M. was nine years old, and E.M. was seven years old.

At the conclusion of the trial, the trial court terminated Mother and Father's parental rights and appointed the Department the children's permanent managing conservator. The trial court found by clear and convincing evidence that Mother had knowingly allowed the children to remain in conditions which endangered the physical or emotional well-being of the children, placed the children with persons who endangered the physical or emotional well-being of the children, constructively abandoned the children, failed to comply with court ordered provisions, and used a controlled substance. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (N), (O), (P). The trial court also found by clear and convincing evidence that termination of Mother's parental rights was in the children's best

---

[2] The Department previously terminated Mother's parental rights to her three daughters in 2009. Father is not a party to this appeal.

2

interests. *See id.* § 161.001(b)(2). Mother then appealed.

## II.    THE EVIDENCE

The Department presented evidence demonstrating the need for termination of Mother's rights through testimony from Allaena Brother, a conservatorship caseworker and Scott Elliff, a court-appointed special advocate.

### A.    Brother's Testimony

Brother stated that the Department removed the children in October 2019 after months of trying to work with Mother through family-based services. The trial court ordered Mother to: provide stable and suitable housing, provide a stable environment free of drugs and domestic violence, allow the Department monthly access to the home, undergo individual counseling; undergo substance abuse treatment; complete random drug tests; complete parenting classes; and participate in domestic violence services. Brother stated that Mother completed outpatient services in June of 2020; however, Mother stopped cooperating with the Department following her arrest for driving while intoxicated (DWI) on August 29, 2020.

Brother testified that although Mother is participating in substance abuse services, the Department's current concern is with alcohol abuse because "[a]s recently as yesterday . . . [Mother] admitted to still drinking." Brother clarified that despite Mother completing parenting classes in November 2019, there are still ongoing patterns of Mother disengaging from her required services. Although Brother acknowledged that Mother insisted that she wanted to engage in her service plan requirements, Mother had a pattern of disengaging with the Department and from her service plan for months at a

3

time. For example, Mother had not submitted to required drug tests or visited the children since August 2020. Additionally, Brother explained that Mother waited to complete her domestic violence services until after trial commenced.[3] Following a psychological evaluation, Mother was ordered to attend individual counseling; Mother did not attend.

According to Brother, Mother did not show stable housing for the children. She declined Department visits at her residence and informed the Department that she was evicted and did not have a home. Brother opined that there was no safe place for the children to reside with Mother. Further, Brother was unable to receive verification of Mother's employment. Most of the employment Mother reported were for arrangements Mother made with acquaintances for construction jobs or yard work. In this regard, Brother stated Mother's day-to-day schedule varied significantly because she was unable to determine the nature and time of her next job. It was Brother's opinion that this type of schedule made Mother inadequate to be the children's caretaker because the children require special care due to their disabilities, and Mother had not shown that she was willing or able to provide such care.

Brother testified that J.M. has severe behavioral issues and receives regular therapy and counseling weekly. J.M. was unable to successfully complete life skills programs and has undergone multiple hospitalizations due to significant aggression he targeted at E.M. and at the foster parents, specifically, "homicidal ideation." According to Brother, the Department continues to struggle with him; he is currently on "child watch" for displaying aggressive behavior. J.M. is very withdrawn, does not open up easily,

---

[3] Mother completed her domestic violence services on July 27, 2021.

4

receives special education services for significant academic delays, and is currently on three medications. While J.M. was in the custody of his parents, he did not receive these services even though he acted out "sexually" such as exposing himself, touching other students in inappropriate places, stalking particular students and teachers, and using inappropriate language. Although he was going to start third grade (and chronologically aged to be in fourth grade), he was barely working on fundamentals, such as Kindergarten level letter recognition, and for this reason he "shuts down" at school. Brother believed J.M. to be very intelligent but very "behind" and attributed a lot of these delays as a result of Mother's parenting. Nonetheless, J.M. "has started to show a little progress," but it is "going to be very slow going" as he was diagnosed with ADHD, oppositional defiant disorder, and bipolar disorder. Despite these diagnoses, Mother had not provided J.M. with any necessary therapy prior to the Department's intervention. Moreover, Mother and Father regularly put J.M. in a parental role to care for E.M.

Brother testified that E.M. had similar behaviors to J.M and was diagnosed with "oppositional defiant disorder" and "disruptive, impulsive control, and conduct disorder." Unlike J.M., E.M. has responded to therapy particularly well, and is "doing amazing. He's thriving," with his foster family. For example, he participated in tee-ball, track, and Bible camp during the summer, and "he is a completely different child than he was a year ago" when he was in the custody of his parents. Brother stated that E.M.'s improvement is "like night and day," and "he is doing fabulous." E.M. currently receives special education services and has transitioned from a "completely behavioral unit" to general education classes. E.M. has expressed to Brother that he does not want to regularly visit with

Mother, Father, or J.M.—not even on the phone.[4]

Brother concluded that Mother was unable to demonstrate she can adequately handle the special needs of the children. Thus, Brother stated that termination of Mother's rights was in the best interest of the children.

## B.    Elliff's Testimony

Elliff testified that he recommends termination of Mother's rights. Regarding the children's desires, he stated that two days prior to trial, the children reported to him that they were happy where they were and have not made statements showing a desire to reunite with Mother. In terms of the physical and emotional needs of the children, Elliff stated that the parents have not attended to the children's needs. According to Elliff, while in Mother's and Father's possession, the children had been in several different schools over the course of one year, and J.M. was removed from school as a first grader, which "is a very unusual occurrence." Administrators in all of the children's previous schools reached out to the Department expressing concern for the well-being of children. For example, administrators knew when the children would visit with their parents because "their behavior becomes extreme for several days after they've had these visits." According to Elliff, "there certainly needed to be some assessment and intervention done on [the children's] behalf," which "had not occurred," during Mother's conservatorship.

Elliff explained that he has seen "considerable improvement" in the school environment with the children because of the services they are receiving as a result of

---

[4] J.M. and E.M. were separated because they did not have a healthy relationship, but the Department testified it was working to reunite them.

the Department's intervention. Elliff testified that if the children had been provided with these services prior to the Department's intervention—while in the parent's conservatorship—then they would not be so behind academically. J.M. could not recognize the letters to spell his own name, and he speaks in one-word or two-word responses. Based on the reports that Elliff has reviewed from the children's counselors, psychiatrists, caregivers, principals, teachers, counselors, and the Department, he believed the children were in physical and emotional danger when living with their parents. Currently, the children "are in safe environments" and returning them to their parents would pose a danger to them. Although Elliff has reached out to Mother, she has not responded to his queries.

## C. Mother's Testimony

Mother testified that she left Father and took the children because Father was physically, mentally, and emotionally abusive with her and the children. Mother admitted that Father would always hit the children, and she "called the cops on him about it." She finally left Father because they all flinched whenever Father would raise his arm, and the children would hide from him under a table. While the children were in her care, she was pulled over for a traffic infraction and arrested for an outstanding warrant. She claims that when she was released from jail, Father did not let her see the children for over a year. Mother attributed the children's psychological issues to their Father for keeping them away from her.

According to Mother, she currently resides in a new house and has been there for one month. Mother stated she is currently employed with a painting company, makes

7

twelve dollars an hour, and works over forty hours a week, six days a week.

She testified that she completed individual counseling last December, and she further claimed that Brother's assertion that Mother did not complete individual counseling was false. It had been over one year since Mother communicated with the children, but she faulted the Department.

Mother believed it was in the best interest of the children to be returned to her because she has "always done [her] best with them . . . the only thing that happened was that [Father] got a hold of them and wouldn't give them back and that's where all the bad environment started." If the children were returned to her, she would make sure that Father was out of the picture, keep E.M. "on the right track" by getting him the help he needs while keeping him in the activities he enjoys, show J.M. love and affection, keep sending J.M. to therapy and counseling, and keep J.M. on his current medications.

### III.    JURISDICTION

By her first issue, Mother argues the trial court's judgment is void because the trial court did not successfully invoke § 263.401(b) to extend its jurisdiction. Specifically, Mother states the "submission of the extension order was untimely," so "the Court lost jurisdiction over the case on September 28, 2020."

**A.    Applicable Law**

Section 263.401(a) of the family code provides that if a trial court fails to commence the trial on the merits or grant an extension within one year after the trial court appointed the Department as temporary managing conservator, the trial court's jurisdiction terminates, and the case is automatically dismissed. *See id.* § 263.401(a)

8

(providing that the trial court's jurisdiction is terminated on the first Monday after the first anniversary of the date the trial court rendered a temporary order appointing the department as temporary managing conservator); *In re G.X.H.*, 627 S.W.3d 288, 292 (Tex. 2021). However, § 263.401(b) provides that the trial court may extend its jurisdiction by an additional 180 days if (1) extraordinary circumstances necessitate the children remaining in the Department's conservatorship, and (2) continuing the Department's appointment is in the children's best interest. *See* TEX. FAM. CODE ANN. § 263.401(b).

Here, the trial court rendered an order appointing the Department temporary managing conservator on September 26, 2019. The first Monday after the anniversary of that date was September 28, 2020. Therefore, unless the trial court either (1) "commenced the trial on the merits," or (2) "granted an extension under Subsection (b) or (b–1)," the court's jurisdiction over the case would terminate on September 28, 2020. *See* § 263.401(a), (b). These findings may be made "orally on the record or in some other writing." *In re G.X.H.*, 627 S.W.3d at 299.

## B.    Discussion

On September 15, 2020, the trial court held a review hearing for conservatorship of the children and to consider the Department's motion for "extension pursuant to § 263.401." Mother and Father did not attend the hearing. The record provides that at the hearing, there was testimony that Mother and Father were not communicating with the Department and were not making progress on their services. Father had relapsed on drugs and was "kicked out of drug court." Mother was not living at the address she had provided and was a "no show" for her scheduled visits with the Department. Mother and

9

Father were not communicating or visiting the children; meanwhile, the children were doing well in the foster system. The Department requested a status quo placement and an "extension due to extenuating circumstances around Covid." Mother's counsel indicated that he had no contact with mother, so he "had no direction on where to go with this" while Father's counsel indicated Father "fell off the wagon quite a while ago." At the conclusion of the hearing, the trial court orally granted a ninety-day extension "if we're not set for trial by then."

Following the trial court's oral extension, the trial court held a docket control conference (DCC) on October 13, 2020. A new scheduling order was "provided to all attorneys of record and submitted to the [trial] court on" November 2, 2020, setting the trial date for February 2021.

Thereafter, on December 31, 2020, the Department submitted a written order for the trial court to memorialize its September 15, 2020 order granting an extension, which the trial court signed on January 2021. The order reads that a hearing was held and that the trial court—before the end of the initial dismissal period—found "that extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship" of the Department.[5]

The family code permits the court to render the order orally. *See* TEX. FAM. CODE ANN. § 101.026; *see also In re R.J.R.*, No. 04-21-00246-CV, 2021 WL 5813827, at *2 (Tex. App.—San Antonio Dec. 8, 2021, no pet.) (mem. op.) ("[T]he court may have orally

---

[5] The order further provides numerous other findings leading to the continuation of the Department's conservatorship.

10

extended the automatic dismissal date during the March 16 hearing."). Mother bears the burden on appeal to show that did not occur. *See In re G.X.H.*, 627 S.W.3d at 300 (finding that the parents bore burden to bring forth record on appeal "to demonstrate the absence of evidence" of findings). Mother did not move to dismiss after the September 28, 2020 dismissal date or otherwise assert the trial court lacked jurisdiction to proceed. *See id.* at 301 ("[W]hile a trial court's failure to timely extend the automatic dismissal date before that date passes—through a docket-sheet notation or otherwise—is jurisdictional, claimed defects relating to the other requirements of [§] 263.401(b) are not. Accordingly, with the exception of a trial court's failure to extend the automatic dismissal date before it passes, complaints regarding the trial court's compliance with the requirements in subsection (b) must be preserved for appellate review."). Conversely, Mother acquiesced to the new trial setting as evidenced by the scheduling order and her failure to object thereafter. Therefore, the record contains no evidence to support Mother's argument that "the Court lost jurisdiction over the case on September 28, 2020." Because we conclude the trial court effectively extended the automatic dismissal date, it retained jurisdiction to render an order of termination, and we proceed to the merits of Mother's appeal. *See id.* at 298 (concluding the only reasonable interpretation of a docket entry regarding a hearing was that the trial court extended the automatic dismissal date); *see also In re P.Z.F.*, No. 05-21-00161-CV, __ S.W.3d ___, 2021 WL 3941667, at *4 (Tex. App.—Dallas Sept. 2, 2021, pet. denied) ("Based on *G.X.H.*, we imply the [§] 263.401(a) findings were made on the record at the oral hearing.").

## IV. STANDARD OF REVIEW

For a trial court to terminate a parent-child relationship, there must be clear and convincing evidence that: (1) the parent's actions or omissions satisfy at least one ground listed in § 161.001(b)(1) of the family code; and (2) termination is in the child's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *In re E.N.C.*, 384 S.W.3d at 802.

Only one predicate act under § 161.001 (b)(1) is necessary to support a judgment of termination in addition to the required finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). To determine whether the evidence is legally sufficient to support the trial court's findings, we look at all the evidence in the light most favorable to the finding and ask whether a reasonable factfinder could have formed a firm belief or conviction the finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence a reasonable factfinder could have disbelieved or found incredible. *Id.*

When reviewing a challenge to the factual sufficiency of the evidence, we give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id.*; *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). We determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about

the truth of the Department's allegations. *In re. J.F.C.*, 96 S.W.3d at 266. We consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *Id.* If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

## V. ENDANGERMENT

Mother argues the evidence is insufficient to support a finding that she placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being.

## A. Applicable Law

Section 161.001(b)(1)(D) and (E) both require a finding of endangerment. To endanger means to expose to loss or injury, to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). The specific danger to a child's physical or emotional well-being need not be established as an independent proposition, but it may be inferred from parental misconduct. *Id.*

Pursuant to subsection D, the endangerment analysis focuses on the evidence of the children's physical environment although the environment produced by the conduct of the parents bears on the determination of whether the children's surroundings threaten their well-being. *In re E.M.*, 494 S.W.3d 209, 221 (Tex. App.—Waco 2015, pet. denied). Subsection D permits termination if the petitioner proves parental conduct caused the children to be placed or remain in an endangering environment. *Id.* It is not necessary

13

that the parent's conduct be directed toward the children or that the children actually be injured; rather, a child is endangered when the environment creates a potential for danger which the parent is aware of but disregards. *Id.* Conduct that demonstrates awareness of an endangering environment is sufficient to show endangerment. *Id.* In considering whether to terminate parental rights, the court may look at parental conduct both before and after the birth of the child. *Id.* Section D permits termination based upon only a single act or omission. *Id.* at 222.

Under subsection E, the relevant inquiry is whether evidence exists that the endangerment of the children's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *Id.* Either the parent's conduct or the conduct of a person with whom the parent knowingly leaves the children that endangers their physical or emotional well-being is sufficient. *Id.* In either instance, it is thus the direct result of the parent's conduct that results in the termination of the parental rights. It is not necessary, however, that the conduct be directed at the children or that the children actually suffer injury. *Id.* Because the evidence pertaining to subsections D and E is interrelated, we may conduct a consolidated review. *In re of M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.).

**B.    Discussion**

Here, the Department alleged multiple instances of neglect, physical and emotional abuse, domestic violence, and drug use. Mother confirmed there were several instances of domestic violence: "[T]he way [Father] talks to them and the way he hits them, you know. Me and [Father] would always fight about it. I called the cops on him about it." A

14

parent's decision to continue living with someone who has committed instances of domestic violence may support an endangerment finding. *See In re M.V.*, 343 S.W.3d 543, 547 (Tex. App.—Dallas 2011, no pet.) (evidence of domestic violence between the mother and father was sufficient to establish that mother knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangered his physical or emotional well-being); *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (providing that a propensity for violence may be considered as evidence of endangerment); *see also In re A.V.W.*, No. 13-12-00684-CV, 2013 WL 1932887, at *5 (Tex. App.—Corpus Christi–Edinburg May 9, 2013, pet. denied) (mem. op.) ("It is self[-]evident that parents perpetrating violence towards [other] members of the family threaten the emotional development and well-being of any child."); *In re K.S.*, No. 02-14-00073-CV, 2014 WL 3867529, at *8–10 (Tex. App.—Fort Worth Aug. 7, 2014, no pet.) (mem. op.) (concluding the evidence sufficient to support termination under subsections D and E where children witnessed violence in home).

The Department observed Mother to be under the influence of a "mind-altering substance" on more than one occasion: Mother had "red, glossy eyes, slurred speech, was not able to stay standing without holding on to the door[]way" and was "using synthetic marijuana" while caring for the children. In such circumstances, Mother refused to provide the Department with the children's location and insisted they "were with a friend." A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Mother tested positive for marijuana.

15

Although Mother provided some negative drug tests, Mother failed to comply with court-ordered drug tests and went through periods of noncompliance. There was evidence that J.M. told school officials that he witnessed his parents use drugs in front of him. Drug use and its effect on a parent's ability to parent may establish an endangering course of conduct. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *see In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied) ("[A] parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, supports a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being."); *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (noting that mother's continued narcotics use after child's removal and in face of drug testing, jeopardized her relationship with her child).

Furthermore, Brother testified that in May 2014, the children were removed from Mother because Mother "was found unresponsive in a car with both the children," was taken to the hospital, and was administered Narcan, a medication to combat drug overdose. *See J.O.A.*, 283 S.W.3d at 345*; see also A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 712 (Tex. App.—El Paso 2012, no pet.) (providing that a factfinder may infer from a parent's past conduct endangering the well-being of the children that similar conduct will recur in the future). Still, Mother denied she was doing drugs, explained that she "was just tired from working," and did not remember having been administered Narcan.

While Mother reported to Brother there was "severe domestic violence" in the

home which the children witnessed and experienced, Mother argues that there was "no concrete evidence presented of abuse" but "mere speculation." However, there was evidence provided to the trial court that at the time of the children's removal from Mother and Father, different reporting parties "observed [the children] with long, deep bruises." Mother testified that she "couldn't do it [any]more . . . [Father] couldn't even pick his hand up because they were all—all of us were flinching. They would go hide under the table . . . ." Abusive and violent conduct by a parent or other person in the children's home may produce an environment that endangers the physical and emotional well-being of the children. *See In re L.E.S.*, 471 S.W.3d 915, 925 (Tex. App.—Texarkana 2015, no pet.).

Furthermore, there was evidence that the children had mental health issues and severe academic delays for which they were not receiving treatment or special education services. Specifically, although the evidence presented showed he was intelligent, J.M. was "significantly behind in his school performance and his behaviors while at school" and was "very academically delayed." Administrators in all of the children's previous schools reached out to the Department expressing concern. Thus, Mother did not address and had not obtained any treatment or support for the children. *See In re E.P.C.*, 381 S.W.3d 670, 684 (Tex. App.—Fort Worth 2012, no pet.) (considering a child's muscle weakness, lack of coordination, delayed milestones, and delayed development as evidence of endangerment); *In re S.G.S.*, 130 S.W.3d 223, 238 (Tex. App.—Beaumont 2004, no pet.) (holding that the children's rotten teeth and developmental delays were product of avoidable neglect caused by parents knowingly engaging in conduct that endangered their children's emotional or physical well-being); *see also In re R.S.*, No. 02-

17

15-00137-CV, 2015 WL 5770530, at *4 (Tex. App.—Fort Worth Oct. 1, 2015, no pet.) (mem. op.) (holding, in context of subsections (D) and (E), that children's untreated medical conditions and developmental condition supported endangerment finding). Brother believed J.M. would need therapy his entire life and would continue to require intensive treatment, which he was not receiving in Mother's care. Although E.M.'s behaviors were initially similar to J.M.'s behaviors, E.M. had significantly improved with medication and responded to therapy as a result of the Department's intervention.

## C.    Conclusion

The trial court was the sole judge of the witnesses' credibility and was free to believe the Department's testimony and to disbelieve Mother's explanations. *See In re J.O.A.*, 283 S.W.3d at 346. There was evidence that Mother did not comply with her family service plan: she failed to provide drug-free tests; she failed to complete her individual counseling; she failed to secure stable housing; and she failed to complete family counseling. *See In re R.F.*, 115 S.W.3d 804, 811 (Tex. App.—Dallas 2003, no pet.) (providing that as part of the endangering-conduct analysis, a court may consider a parent's failure to complete a service plan). We find that the evidence is legally and factually sufficient to support the trial court's findings that Mother knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endanger the children and engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangers the children. *See* TEX. FAM. CODE ANN. § 161.001 (b)(1)(D), (E). We overrule Mother's second issue. Because we find that the evidence is sufficient under subsections D and E, we need not address the remaining statutory

18

grounds Mother challenges on appeal. *See In re A.V.*, 113 S.W.3d at 362 (providing that only one predicate act under § 161.001(b)(1) is necessary to support a judgment of termination in addition to the required finding that termination is in the child's best interest).

## VI.    BEST INTEREST

By her third issue, Mother argues it was not in the best interest of the children to terminate her parental rights.

## A.    Applicable Law

When considering the best interest of a child, we recognize there is a strong presumption that the child's best interest is served by preserving the parent-child relationship. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). However, we also presume that prompt and permanent placement of the child in a safe environment is in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a).

In determining whether a parent is willing and able to provide the child with a safe environment, we consider the factors set forth in the family code as well as the *Holley* factors.[6] *See id.* § 263.307(b); *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive. *In re C.H.*, 89 S.W.3d at 27. "The absence of evidence about some of these considerations would not preclude a factfinder from reasonably

---

[6] These factors include: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the child's best interest; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *Id.* In analyzing these factors, we focus on the best interest of the child, not the best interest of the parent. *Dupree v. Tex. Dep't of Protective & Regul. Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ).

Evidence that proves one or more statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d at 28. "A best-interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence." *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). "A trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." *Id.*

**B.      Discussion**

  **1.      Children's Desires, Ages, and Vulnerabilities**

The record shows that none of the children expressed a desire to return to Mother or even to speak to her on the phone. Conversely, the children reported to the Department that they were happy in their current placement. *See In re C.N.S.*, 105 S.W.3d 104, 106 (Tex. App.—Waco 2003, no pet.) (considering the evidence of a lack of an emotional bond between the children and the parent as relevant in determining the child's desires). Furthermore, there was significant testimony that both children have severe special needs, which Mother neglected prior to the Department's intervention. J.M. currently receives weekly therapy and counseling, and the Department testified the children are

20

well-cared for in the Department's custody. *See Holley*, 544 S.W.2d at 371–72 (stating that courts may consider plans for child by individuals or agency seeking custody). Although E.M. was confined to a behavioral unit when the Department first intervened, he is now in a general classroom, and he is "thriving" with his foster family. *See* TEX. FAM. CODE ANN. § 263.307(b)(12)(F) (providing that court may consider whether the family understands the child's needs and capabilities); *In re J.M.T.*, 519 S.W.3d 258, 269 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (considering evidence of a child's bond with foster mother in the best-interest analysis). The record indicates that Mother was "popping in and out" of the children's lives and had not seen the children in over a year. These factors weigh in favor of termination.

### 2. Children's Present and Future Emotional and Physical Needs, Plans for the Children, and Parental Abilities

"The need for permanence is the paramount consideration for the child's present and future physical and emotional needs." *In re S.J.R.-Z.*, 537 S.W.3d at 693. "[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE ANN. § 263.307(a). The children have extraordinary psychological and emotional needs. Mother did not accommodate, intervene, or even address these needs. Instead, she blames Father entirely for the children's regressions and developmental delays. There was testimony that if Mother had intervened earlier, the children would not be so delayed. Mother failed to meet the children's medical, developmental, and emotional needs, but both children have improved significantly since their removal from Mother. *See In re S.D.*, 980 S.W.2d 758, 764 (Tex. App.—San Antonio 1998, pet. denied) (holding it was in the children's best interests to

place them "in a stable environment where they can receive proper care for their special needs").

Brother testified that Mother "confirmed [to Brother] the extensive domestic violence that was in the home," which the children witnessed and outcried until Mother finally decided to remove the children from that environment. *See In re C.J.F.*, 134 S.W.3d 343, 354 (Tex. App.—Amarillo 2003, pet. denied) (providing that a parent's failure to protect their children from abuse is evidence supporting the best interest finding). However, after Mother was arrested, Father took custody of the children, and there is no evidence that Mother took action, such as reporting Father to the Department, for example, to remove the children from his care knowing that he was abusive to the children. Thus, Mother was aware that the children were placed and remained in a dangerous environment. *See In re A.M.*, 385 S.W.3d 74, 83 (Tex. App.—Waco 2012, pet. denied) (considering the parent's history of endangering and neglecting the children and of exposing the children to domestic violence in its review of the evidence supporting the best interest determination). Additionally, there was extensive evidence of Father's habitual drug use, addiction, and overdose—still, Mother claims Father "got a hold of them and wouldn't give them back." *See In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied) (providing that evidence that a parent allowed a child to be around persons using drugs can support a conclusion that the child's surroundings endanger the child's physical or emotional well-being); *see also In re J.J.*, No. 07-13-00117-CV, 2013 WL 4711542, at *4 (Tex. App.—Amarillo Aug. 29, 2013, no pet.) (mem. op.) ("[A] parent's decision to leave a child in the care of a known drug user is relevant to the predicate acts

or omissions outlined in subsections (D) and (E).").

Brother was concerned that if the children were returned to Mother, she would not know where they would reside and would not know of a safe place to take the children. She was concerned about returning the kids to Mother because Mother had not demonstrated sobriety or an ability to address the special needs of the children. These factors weigh in favor of termination.

### 3. History of Substance Abuse and Acts of Violence

Additional factors to consider in a best interest determination are whether there is a history of substance abuse or assaultive conduct by the child's family or others who have access to the child's home. *See* TEX. FAM. CODE ANN. § 263.307(b)(7), (8). Mother testified that she was using drugs when she was pregnant with E.M.; however, she denied previously admitting to smoking cigarettes dipped in cocaine during her pregnancy because "that's far back." *See In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.) ("A mother's use of drugs during pregnancy may amount to conduct that endangers the physical and emotional well-being of the child."). The Department observed Mother to be under the influence of a mind-altering substance several times. *See In re J.M.T.*, 519 S.W.3d 258, 270 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). (stating that parental drug abuse reflects poor judgment and is relevant in determining the child's best interest). Mother was aware she tested positive for alcohol more than once, but she stated that "one little beer on the way home" is "nothing outrageous and bad" despite her DWI arrest while this case was pending. *See id.* Mother further tested positive for marijuana on August 20, 2019.

Brother testified that in May of 2014, the children were initially removed from Mother because Mother "was found unresponsive in a car with both the children," was taken to the hospital, and was administered a medication to combat drug overdose.[7] *See In re S.J.R.-Z.*, 537 S.W.3d at 693 ("This court considers a parent's conduct before and after the Department's removal of the children."); *see also In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006); *In re E.A.*, No. 13-06-503-CV, 2007 WL 2471459, at *8 (Tex. App.—Corpus Christi–Edinburg Aug. 31, 2007, no pet.) (mem. op.) ("Because there is evidence that appellant's past actions were unsuitable, the trial court could have inferred that similar unsuitable conduct could recur in the future if the children are returned to appellant."). These factors weigh in favor of termination.

### 4. Programs Available and Parent's Acts, Omissions, and Willingness to Accept Help

According to Mother, Father was the only culprit; however, Mother conceded that the children were removed from *her* care in 2014 when Father was not in the picture.[8] There was evidence that after removal, Mother tested positive for alcohol several times, was arrested for DWI, failed to submit to drug tests, and failed to complete her required court-ordered services. *See In re K.-A.B.M.*, 551 S.W.3d 275, 287 (Tex. App.—El Paso 2018, no pet.) (providing that a parent's failure to submit to a drug test can be considered a positive result); *In re J.M.T.*, 519 S.W.3d 258, 267 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) ("A factfinder may infer from a parent's failure to take the initiative to complete

---

[7] At the time, J.M. was two years old, and E.M. was four months old.

[8] Mother admitted that prior to this case, her three daughters were removed from her care because she continued to allow them to be around her previous paramour someone who had sexually abused them.

the services required to regain possession of his child that he does not have the ability to motivate himself to seek out available resources needed now or in the future."); *see also* TEX. FAM. CODE ANN. § 161.001(b)(1)(O) (providing that a parent's failure to complete even one requirement of the family service plan may support termination under this subsection.); *In re J.M.T.*, 519 S.W.3d at 267; *In re M.C.G.*, 329 S.W.3d at 676 ("The Family Code does not provide for substantial compliance with a family services plan.").

Moreover, there was evidence that while the kids were in Mother's care, they were not attending school. The Department testified that Mother had a pattern of disengaging from her services for months at a time, demonstrating that Mother was not willing to interact with the Department.[9] *See* TEX. FAM. CODE ANN. § 263.307(b)(10) (stating that willingness and ability "to cooperate with and facilitate an appropriate agency's close supervision" is relevant consideration in deciding whether parent can provide child with safe environment); *Wilson v. State*, 116 S.W.3d 923, 925 (Tex. App.—Dallas 2003, no pet.) (providing that a parent's lack of motivation in improving parenting skills is evidence to support a finding that termination is in the child's best interest). There was evidence that Mother did not provide the children with a safe environment, did not have a concrete plan for the children moving forward, was unable to provide stability for the children, exposed the children to domestic violence, tested positive for alcohol and marijuana, failed to complete her court-ordered services, was consistently unstable, and was unwilling to improve her parenting skills. These factors weigh in favor of termination.

---

[9] Mother attributed this to not having a phone, working two or three jobs a day, and relying on the phone at the laundromat.

**C.     Conclusion**

Having reviewed the record and considered the evidence in the appropriate light for each standard of review, we conclude the trial court could have formed a firm belief or conviction that termination of Mother's parental rights is in the children's best interests. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). Accordingly, we hold the evidence is legally and factually sufficient to support the trial court's best interest findings. We overrule Mother's third issue.

**VII.     CONCLUSION**

We affirm the trial court's judgment.

JAIME TIJERINA
Justice

Delivered and filed on the
11th day of August, 2022.

26